CALABRESI, Circuit Judge:
 

 Martin Tankleff was convicted in New York state court for the murder of his parents, Seymour and Arlene Tankleff. On February 7, 1996, he filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The United States District Court for the Eastern District of New York (Thomas C. Platt, Judge) denied Tankleff s petition on January 30, 1997. On February 28, 1997, Judge Platt granted Tankleff a certificate of appealability.
 

 Tankleff raises four main claims in his habeas petition. First, he asserts that his Fifth Amendment rights were violated by the manner in which his confession was obtained. Second, he contends that the jury selection process violated his constitutional rights. Third, he argues that the prosecution violated his rights under
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding evidence that he could have used in the cross-examination of two key witnesses. Finally, he suggests that certain arguments made by the prosecution in summation violated his due process rights.
 

 
 *240
 
 After careful analysis of all of Tankleffs claims, we have concluded that he is entitled to federal court relief on only one of them— his claim that the trial court erred in refusing to consider Tankleffs objection that the prosecution had improperly used its peremptory strikes against African-American jurors. The trial court refused to entertain this objection in the mistaken belief that, because Tankleff is not himself an African American, he could not challenge the prosecution’s use of its peremptory strikes against African-American jurors under
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). But the Supreme Court made clear in
 
 Powers v. Ohio,
 
 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), that a
 
 Batson
 
 claim is in no way precluded by the fact that the defendant’s race differs from that of the excluded jurors.
 
 See id.
 
 at 415-16, 111 S.Ct. at 1373-74.
 

 Judge Platt recognized that the state court had erred in this regard, but held that the error was harmless. Harmless error analysis is inappropriate in this context, however, because exclusion of jurors on the basis of race is a structural error that can
 
 never
 
 be harmless.
 
 See Peck v. United States,
 
 106 F.3d 450, 454 (2d Cir.1997) (“Structural errors ‘defy analysis by harmless error standards -'”) (quoting
 
 Brecht v. Abrahamson,
 
 507 U.S. 619, 629-30, 113 S.Ct. 1710, 1717-18, 123 L.Ed.2d 353 (1993)). Accordingly, we hold that Tankleff is entitled to a hearing on his
 
 Batson
 
 claim, and remand the case to the district court for further proceedings. As to all of Tankleffs other claims, we find that none of them warrants federal ha-beas relief.
 

 7.
 
 FACTS
 

 The relevant facts — as determined by the state court and recounted in the testimony of various police officers — are as follows. Police arrived at the Tankleff residence in a wealthy section of Belle Terre, New York, at 6:17 a.m. on September 17, 1988, in response to Martin Tankleffs 911 phone call. They found seventeen-year-old Tankleff outside the house, shouting that someone had murdered his parents. Arlene Tankleff was lying dead in the master bedroom of the house, while Seymour Tankleff was unconscious and gravely wounded in the study. Tankleff said he had discovered his parents’ bodies when he awoke for school. He also told the police that he believed his father’s former business partner, Jerry Steuerman, had committed the crime. Steuerman owed Seymour Tankleff a great deal of money, and had been at their house the evening before for a late-night poker game.
 

 Shortly after the police arrived, one officer instructed Tankleff and his brother-in-law, Ronald Rother, to leave the house and go to separate police cars so that they wouldn’t “contaminate each other’s story.” At 6:37 a.m., Tankleff went outside and sat in the front seat of a police car. Starting at around 7:40 a.m., a series of homicide detectives interviewed Tankleff near the police cars. At no time during these interviews was Tankleff given the warnings required by
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The detectives discussed what Tankleff had told each of them and, noting some inconsistencies in his accounts of the events of that morning, decided to take him to police headquarters for further questioning. At this point, the police concede, they considered Tankleff a suspect. At 8:40 a.m., Tankleff agreed to go with Detective McCready to the police station. McCready questioned him further during the forty-minute drive. At 9:40 a.m., Detectives McCready and Rein took Tankleff to a ten-foot by ten-foot, windowless room where he was interviewed continuously for the next two hours.
 

 The defense has characterized this interview as “increasingly hostile.” The government disputes this interpretation, but acknowledges that Tankleff was questioned in detail about inconsistencies in his story and that the detectives openly expressed their disbelief with his version of the morning’s events. At one point, they asked him to demonstrate how he performed first aid on his father. Detective McCready then leaned forward and said that he found Tankleffs account “ridiculous and unbelievably absurd.” The government asserts that while the detectives “ at times raised and lowered their voices as they related inconsistencies in
 
 *241
 
 [Tankleffs] account to [them], and indeed quickened the pace of the interview at approximately 11:30 to 11:40 a.m., they never yelled at or somehow ‘browbeat’ ” Tankleff. At approximately 11:45 a.m., McCready left the interview room and faked receiving a telephone call. On the phone, he spoke in a voice loud enough to be overheard by Rein, who was still in the interview room with Tankleff, and presumably was overheard by Tankleff as well. After a few minutes, McCready hung up the phone and returned to the interview room. He said that he had just spoken with a detective at the hospital and that the doctors had pumped Seymour Tankleff full of adrenaline, that he had come out of the coma, and that he had accused his son, Martin. This story was not true. Seymour remained in a coma until his death a few weeks later, never awakening and never accusing his son of the crime.
 

 Tankleff continued to deny having committed the crime, saying that his father might have said that because Tankleff was the last person he saw before falling unconscious. Rein asked if Seymour was conscious when Tankleff “beat and stabbed him.” Tankleff then offered to take a lie detector test, which the police refused to administer. Rein asked, “Marty, what should we do to a person that did this to your parents?” Tankleff responded, “Whoever did this to them needs psychiatric help.” At this point, Tankleff said, “Could I have blacked out and done it?” and asked whether he could have been “possessed.” The detectives encouraged him to say more, and Tankleff uttered, “[I]t’s coming to me.”
 

 Only then, at around 11:54 a.m., did Detective McCready stop the questioning and, for the first time, give Tankleff the
 
 Miranda
 
 warnings. Tankleff waived his rights, and the interrogation continued. Tankleff stated, “I need psychiatric help,” and then proceeded to describe to the detectives the reasons for his actions, the sequence of events, and the manner in which he had committed the acts. He was placed under formal arrest later that afternoon.
 

 The trial court denied Tankleffs motion to suppress the confession, and Tankleff was convicted of both murders after a jury trial. He was sentenced to two consecutive indeterminate terms of twenty five years to life. On direct appeal, the New York Supreme Court, Appellate Division affirmed his conviction in a three-to-two decision.
 
 See People v. Tankleff,
 
 199 A.D.2d 550, 606 N.Y.S.2d 707 (App. Div.1993),
 
 aff'd
 
 84 N.Y.2d 992, 622 N.Y.S.2d 503, 646 N.E.2d 805 (1994). The two dissenting judges believed that Tankleffs confession was obtained in violation of
 
 Miranda
 
 and wrote that “[i]n view of the absence of any other evidence connecting the defendant to the murders, except for the confession which he disavowed at the trial, the indictments should be dismissed.”
 
 Id.
 
 606 N.Y.S.2d at 712 (O’Brien, Eiber,
 
 JJ.,
 
 dissenting). The dissenting judges also thought that the prosecutor’s improper comments during closing arguments warranted reversal.
 
 See id.
 
 at 712-13. The New York Court of Appeals unanimously affirmed the appellate division’s decision upholding Tankleffs conviction.
 
 See People v. Tankleff
 
 84 N.Y.2d 992, 622 N.Y.S.2d 503, 646 N.E.2d 805 (1994). Tank-leff filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which the district court denied.
 

 II. DISCUSSION
 

 A. Certificate of Appealability
 

 As a preliminary matter, the state argues that Tankleff is required to obtain a certificate of appealability (“COA”) in accordance with the requirements established by the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”), Pub.L. No. 104-132, 110 Stat. 1214, and that the COA granted by the district court was defective under that Act. The AEDPA replaced the old certificate of probable cause (“CPC”) with the new COA.
 
 See
 
 28 U.S.C. § 2253(c)(2), (3) (West Supp.1997). In order to obtain a CPC, a petitioner was required to “make a substantial showing of the denial of [a] federal right.”
 
 Barefoot v. Estelle,
 
 463 U.S. 880,893, 103 S.Ct. 3383, 3394-95, 77 L.Ed.2d 1090 (1983) (internal quotation marks omitted and alteration in original). The statute as amended requires the same showing from petitioners seeking a COA,
 
 see
 
 28 U.S.C. § 2253(c)(2), but also provides that COA “shall indicate which specific issue or issues
 
 *242
 
 satisfy” that standard,
 
 id.
 
 § 2253(e)(3). The state contends that the district court’s order granting Tankleff a COA was insufficiently specific to satisfy the requirements of the amended § 2253(c)(3). Furthermore, the state argues, the district court’s opinion suggests that only the
 
 Brady
 
 issue satisfies the requirements of § 2253(c)(2). The state, therefore, asks us to amend the COA to limit the appeal to the
 
 Brady
 
 issue or, in the alternative, to remand the case to the district court for more specific findings.
 

 The AEDPA does not, however, govern the case before us because Tankleff filed his habeas petition before the new law went into effect. In
 
 United States v. Perez,
 
 129 F.3d 255 (2d Cir.1997), we held that the requirements of § 2253(c) did
 
 not
 
 apply
 
 to
 
 a defendant who had filed his § 2255 petition before the effective date of the AEDPA, despite the fact that both the denial of his petition by the district court and the filing of his appeal occurred after this date.
 
 See id.
 
 at 260;
 
 see also Lindh v. Murphy,
 
 — U.S.-,-, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997) (holding that another provision of the AED-PA, codified at 28 U.S.C. § 2254(d), did not apply retroactively to cases pending before the statute’s effective date). We see no reason to treat § 2254 petitions differently from § 2255 petitions in terms of the retroactive application of the requirements of § 2253(c), and so hold that Tankleff was not required to obtain a COA.
 

 As a result, we evaluate what the district court termed a “COA” under the old “CPC” rubric and need not determine whether it is specific enough to satisfy the revised § 2253. As stated above, in order to receive a CPC, a petitioner must “make a substantial showing of the denial of [a] federal right.”
 
 Barefoot,
 
 463 U.S. at 893, 103 S.Ct. at 3394 (internal quotation marks omitted and alteration in original). A petitioner need not show that he would prevail on the merits, but “must demonstrate that the issues are debatable among jurists of reason; that a court
 
 could
 
 resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further.”
 
 Id.
 
 at 893 n. 4, 103 S.Ct. at 3394-95 n. 4 (internal quotation marks and citation omitted, emphasis added, and alteration in original);
 
 accord Nelson v. Walker,
 
 121 F.3d 828, 832 (2d Cir.1997). Tankleffs claims clearly satisfy this standard: we have determined that Tankleffs
 
 Batson
 
 claim has substantial merit; the Appellate Division split three-to-two on both the
 
 Miranda
 
 question and the propriety of the prosecution’s summation; and the district court thought that the
 
 Brady
 
 issue was a “close call.” It follows that Tankleffs claims are all properly before this court.
 

 B. Tankleffs Confession
 

 Tankleff argues that his confession should have been suppressed because it was involuntary and because it was obtained in violation of
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). These two claims are interrelated, but analytically distinct. If a defendant’s confession was obtained by “‘techniques and methods offensive to due process’ or under circumstances in which the suspect clearly had no opportunity to exercise ‘a free and unconstrained will,’ ” the statements are inadmissible under the Fifth Amendment.
 
 Oregon v. Elstad,
 
 470 U.S. 298, 304, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985)
 
 (quoting Haynes v. Washington,
 
 373 U.S. 503, 515, 514, 83 S.Ct. 1336, 1344, 1343-44, 10 L.Ed.2d 513 (1963)) (citations omitted). The prophylactic rule of
 
 Miranda
 
 sweeps more broadly than the Fifth Amendment itself, however, and requires the suppression of some confessions that, while perhaps not actually involuntary, were obtained in the presumptively coercive environment of police custody.
 
 See, e.g., id.
 
 at 306-07,105 S.Ct. at 1291-92;
 
 New York v. Quarles,
 
 467 U.S. 649, 654, 104 S.Ct. 2626, 2630-31, 81 L.Ed.2d 550 (1984) (“The
 
 Miranda
 
 Court ... presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his
 
 Miranda
 
 rights and freely decides to
 
 forgo
 
 those rights.”) (footnote omitted).
 

 A suspect is entitled to Miranda warnings only if he or she is interrogated while “in custody.” See,
 
 e.g., Thompson v.
 
 
 *243
 

 Keohane,
 
 516 U.S. 99, 100-01, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995). The trial court found that Tankleff was not in custody prior to the administration of the
 
 Miranda
 
 warnings and that his confession was therefore admissible. Similarly, the three-judge majority of the Appellate Division held that Tankleff was not in custody when he arrived at the police headquarters, and stated that Detective McCreadjfs ruse was irrelevant to Tankleffs custody status.
 
 See Tankleff,
 
 606 N.Y.S.2d at 710. Since Tankleff was not deemed to be in custody before he received the
 
 Miranda
 
 warnings, the appellate court held that the admission of his confession was proper.
 
 See id.
 

 The two dissenting judges on the Appellate Division believed that Tankleff was clearly in custody after Detective MeCready’s ruse and said that “no reasonable, innocent person who found himself identified as the perpetrator in this manner would have believed that he was free to leave.”
 
 Id.
 
 at 712 (O’Brien, Eiber,
 
 JJ.,
 
 dissenting). In addition, the dissenters noted, “even after employing the ruse, the interrogating detectives continued to question the defendant without the benefit of
 
 Miranda
 
 warnings until he began to break and give inculpatory statements.” Id The dissenters concluded that “[ujnder these circumstances, the issuance of the
 
 Miranda
 
 warnings to the defendant shortly after the ruse was insufficient to dissipate the taint of the previous improper police conduct, as the defendant was subjected to continuous custodial questioning.”
 
 Id.
 
 (citing
 
 People v. Chappie,
 
 38 N.Y.2d 112, 378 N.Y.S.2d 682, 341 N.E.2d 243 (1975)).
 

 The New York Court of Appeals stated that “[tjhere is support in the record for the undisturbed finding of the trial court that defendant was not in custody and thus was not entitled to
 
 Miranda
 
 warnings at any point before he indicated his desire [to confess.]” And in view of its “limited power to review mixed questions of law and fact,” the court affirmed the Appellate Division.
 
 See Tankleff,
 
 622 N.Y.S.2d at 504, 646 N.E.2d 805 (citing
 
 People v. Harrison,
 
 57 N.Y.2d 470, 457 N.Y.S.2d 199, 443 N.E.2d 447 (1982)).
 

 The Supreme Court has held that two discrete inquiries are involved in determining whether a person is “in custody” for
 
 Miranda
 
 purposes: “first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.”
 
 Thompson,
 
 516 U.S. at 112, 116 S.Ct. at 465 (footnote omitted). The first question is purely factual, and the state court’s answer to it is afforded a presumption of correctness under § 2254(d).
 
 [1]
 
 The second determination is a mixed question of fact and law qualifying for
 
 de novo
 
 review by the habeas court.
 
 See id.
 

 In the case before us, the first determination — “what happened” — is not really in dispute. The police interrogated Tankleff on and off from 6:17 to 11:54 a.m. without giving him
 
 Miranda
 
 warnings. The only dispute is over the ultimate legal issue— whether Tankleff was “in custody” at any point before 11:54 a.m. — a question on which we owe no special deference to the state court’s findings.
 

 In determining whether a suspect was in custody, we look at all the circumstances surrounding the interrogation. The relevant inquiry is “how a reasonable man in the suspect’s position would have understood his situation.”
 
 Berkemer v. McCarty,
 
 468 U.S. 420, 442, 104 S.Ct. 3138, 3151-52, 82 L.Ed.2d 317 (1984). And custody exists for
 
 Miranda
 
 purposes if a reasonable person in that position would “have felt he or she was not at liberty to terminate the interrogation and leave.”
 
 Thompson,
 
 516 U.S. at 112, 116 S.Ct. at 465. As the Second Circuit recently stated:
 

 The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable
 
 *244
 
 person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.
 

 United States v. Kirsh,
 
 54 F.3d 1062, 1067 (2d Cir.) (internal quotation marks and citation omitted),
 
 cert. denied,
 
 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995);
 
 see also United States v. Morales,
 
 834 F.2d 35, 38 (2d Cir.1987) (a custodial setting is evidenced by “inherently coercive pressures that tend to undermine the individual’s will to resist and to compel him to speak”).
 

 Courts have looked at various factors in making this determination. These include: whether a suspect is or is not told that she is free to leave,
 
 see Campaneria v. Reid,
 
 891 F.2d 1014, 1021 n. 1 (2d Cir.1989); the location and atmosphere of the interrogation,
 
 see Oregon v. Mathiason,
 
 429 U.S. 492, 494-95, 97 S.Ct. 711, 713-14, 50 L.Ed.2d 714 (1977); the language and tone used by the police,
 
 see United States v. Guamo,
 
 819 F.2d 28, 31-32 (2d Cir.1987); whether the suspect is searched, frisked, or patted down,
 
 see United States v. Wilson,
 
 901 F.Supp. 172, 175 (S.D.N.Y.1995); and the length of the interrogation,
 
 see Berkemer,
 
 468 U.S. at 437-38, 104 S.Ct. at 3148-49.
 

 Based on the totality of the circumstances, we believe that Tankleff was in custody and hold that he was entitled to the
 
 Miranda
 
 warnings at some point prior to 11:54 a.m., when he was finally advised of his rights. For the last two hours, he had been subjected to increasingly hostile questioning at the police station, during which the detectives had accused him of showing insufficient grief, had said that his story was “ridiculous” and “absurd,” and had added that they simply “could not accept” his explanations. Finally, at 11:45 a.m. they told him that his father had woken up from a coma and accused him of the attack. If not before, then certainly by this point in the interrogation no reasonable person in Tankleffis position would have felt free to leave. Tankleff should, therefore, have been advised of his rights as required by
 
 Miranda
 
 much earlier than he was, and all of the inculpatory statements he made before receiving the warnings should have been suppressed.
 

 Our analysis does not end here, however, because the police did eventually, if belatedly, administer the
 
 Miranda
 
 warnings. Tankleff then waived his rights, and repeated and elaborated upon his confession. Under the Supreme Court’s holding in
 
 Oregon v. Elstad,
 
 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), it does not follow that these later statements must be suppressed as “fruit” of the original
 
 Miranda
 
 violation. In
 
 Elstad,
 
 the Court stated:
 

 It is an unwarranted extension of
 
 Miranda
 
 to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect’s ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.
 

 Id.
 
 at 309, 105 S.Ct. at 1293. Thus, the Court stated, “[t]hough
 
 Miranda
 
 requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.”
 
 Id.
 

 We must, therefore, consider whether the circumstances surrounding Tankleffis “first,” unwarned confession were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights, thereby requiring the suppression of his “second,” warned confession. Serious pressures inherent in custodial interrogation will inevitably be present in any case under
 
 El-
 
 stad—which, after all, addresses situations in which a defendant was in custody and entitled to
 
 Miranda
 
 warnings at some point before those warnings were given. Thus, we cannot rely solely on the
 
 Miranda
 
 presumption that custodial interrogation is coercive in determining whether Tankleffis second confession must be suppressed. We must look,
 
 *245
 
 once again, to the totality of the circumstances.
 
 Cf Compañería,
 
 891 F.2d at 1019-20 (examining “all the circumstances surrounding the law enforcement officials’ conduct to ascertain whether it overcame the accused’s will to resist and brought about a confession that was not freely self-determined”);
 
 United States v. Anderson,
 
 929 F.2d 96, 99 (2d Cir.1991) (in determining the voluntariness of a confession, courts look to the accused’s characteristics, the conditions of the interrogation, and the conduct of law enforcement officials);
 
 Green v. Scully,
 
 850 F.2d 894, 901-02 (2d Cir.1988) (same).
 
 [2]
 

 We have previously stressed the fact-specific nature of these sorts of determinations. As we said in
 
 Green v. Scully,
 
 “each case rests on its own state of facts and ... what was adequate in one ease to produce an involuntary confession does not establish that the same result has been created in a different, but somewhat similar set of circumstances.” 850 F.2d at 902.
 
 Compare Anderson,
 
 929 F.2d at 102 (“Under the totality of the circumstances, [DEA agent’s] statements contributed to the already coercive atmosphere inherent in custodial interrogation and rendered [the defendant’s] first confession involuntary as a matter of law” and barred the admission of his second confession under Elstad);
 
 and Quartararo v. Mantello,
 
 715 F.Supp. 449, 456-66 (E.D.N.Y.) (granting habeas to fifteen-year-old defendant who, without receiving
 
 Miranda
 
 warnings, had been subjected to four hours of incommunicado interrogation and was told by police that another witness had accused him of the murder), aff
 
 'd,
 
 888 F.2d 126 (2d Cir.1989);
 
 with Green,
 
 850 F.2d at 904 (holding that police tactics “considered together did not overbear [the defendant’s] will and bring about his confession”).
 

 Finally, it bears emphasizing that
 
 Elstad
 
 is not a license for police to neglect the
 
 Miranda
 
 warnings in order more easily to obtain a confession, on the theory that they can remedy this omission after the fact. As we have stated, “the use of coercive and improper tactics in obtaining an initial confession may warrant a presumption of compulsion as to a second one, even if the latter was obtained after properly administered
 
 Miranda
 
 warnings.”
 
 Anderson,
 
 929 F.2d at 102 (citing
 
 Elstad,
 
 470 U.S. at 314, 105 S.Ct. at 1296). Thus, we look to
 
 Miranda’s “
 
 ‘twin rationales — trustworthiness and deterrence — ’ to see whether suppression of the second statement would serve the general goal of deterring unlawful police conduct and the Fifth Amendment goal of assuring the receipt of trustworthy evidence.”
 
 Id.
 
 (quoting
 
 Elstad,
 
 470 U.S. at 308, 105 S.Ct. at 1292-93).
 

 The issue is a close one. But, based on all the circumstances, we conclude that, under
 
 Elstad,
 
 the interrogation that took place before the reading of the
 
 Miranda
 
 warnings barely did not entail that degree of coercion that would irredeemably taint Tankleffs “second,”
 
 Mirandized
 
 confession. Furthermore, and crucially important, there is no indication in the record that Tankleff did not understand his rights once he was given the warnings or that his subsequent waiver of those rights was anything but knowing and voluntary. Accordingly, we hold that Tank-leffs “second” confession was properly admitted.
 

 The court should, nonetheless, have suppressed Tankleffs inculpatory
 
 pre-Miranda
 
 statements. Since those statements were, however, brief and substantially the same as some of his later, admissible confession, this error was harmless beyond a reasonable doubt.
 
 See Rollins v. Leonardo,
 
 938 F.2d 380, 382 (2d Cir.1991) (per curiam) (applying harmless error doctrine to
 
 Miranda
 
 violation);
 
 see also Arizona v. Fulminante,
 
 
 *246
 
 499 U.S. 279, 306-12, 111 S.Ct. 1246,1262-66, 113 L.Ed.2d 302 (1991) (applying harmless error analysis even to a coerced confession).
 

 There remains one loose end with respect to Tankleffs
 
 Miranda
 
 claims. We note that the state courts did not distinguish between Tankleffs “first” and “second” confessions. They presumably did this in part because they — incorrectly under
 
 federal
 
 law — held that Tankleff was not in custody when he made his “first” confession. But they, perhaps, also failed to distinguish between the confessions because the New York Court of Appeals has declined on state constitutional grounds to follow the rule of
 
 Oregon v. Elstad. See People v. Bethea,
 
 67 N.Y.2d 364, 502 N.Y.S.2d 713, 714, 493 N.E.2d 937, 938 (1986) (per curiam) (“We conclude that the mandate of N.Y. Constitution, article I, § 6 that ‘[n]o person ... shall ... be compelled in any criminal case to be a witness against himself would have little deterrent effect if the police know that they can as part of a continuous chain of events question a suspect in custody without warning, provided only they thereafter question him or her again after warnings have been given.”) (alteration in original). Thus, under New York law the rule with respect to
 
 Miranda
 
 warnings remains that “[l]ater is too late, unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning.”
 
 People v. Chappie,
 
 38 N.Y.2d 112, 378 N.Y.S.2d 682, 685-86, 341 N.E.2d 243, 245-46 (1975);
 
 Bethea,
 
 502 N.Y.S.2d at 714, 493 N.E.2d 937 (“The rule of the
 
 Chappie
 
 case, therefore, continues as a matter of State constitutional law, to govern the admissibility of statements obtained as a result of continuous custodial interrogation.”).
 

 It might appear- — given the state court holdings rejecting
 
 Elstad
 
 and given our decision that Tankleff was in custody, thereby making his “first” confession inadmissible under
 
 Miranda
 
 — that we should also deem his second confession to be excludable. But
 
 we
 
 can only grant habeas relief based on violations of
 
 federal
 
 rights,
 
 see
 
 28 U.S.C. § 2254(d)(1). Thus, it is not for us to say whether Tankleff might or might not have any claim based on state constitutional law as a result of our holding that Tankleff was, under
 
 Miranda
 
 and its federal progeny, in custody at the time of his “first” confession. We note that the validity of such a claim would seem to turn on whether the definition of “custody” under the New York constitution tracks the definition of that term under the federal constitution.
 
 Cf Michigan v. Long,
 
 463 U.S. 1032, 1037-40, 103 S.Ct. 3469, 3474-76, 77 L.Ed.2d 1201 (1983) (discussing the difficulties faced by federal courts in ascertaining “whether state courts have used federal law to guide their application of state law or to provide the actual basis for the decision that was reached”);
 
 South Dakota v. Neville,
 
 459 U.S. 553, 556-58 n. 5, 103 S.Ct. 916, 919 n. 5, 74 L.Ed.2d 748 (1983) (same).
 

 C. Jury Selection
 

 1. Tankleffs Absence from the Im-Cham-bers Questioning of Potential Jurors
 

 A criminal defendant is entitled “to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.”
 
 Faretta v. California,
 
 422 U.S. 806, 819-20 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975);
 
 Illinois v. Allen,
 
 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). It is well-established that the impaneling of the jury is one such stage.
 
 See, e.g., United States v. Hernandez,
 
 873 F.2d 516, 518 (2d Cir.1989). Tankleff claims that his constitutional right to attend all material portions of his trial was violated by the procedure employed by the trial court in screening potential jurors.
 

 Because of extensive pretrial publicity, the court followed a special process in impaneling the jury. First, approximately 500 potential jurors were questioned in open court about 1) whether they had already formed an opinion about Tankleffs guilt based on newspaper and television reports and 2) whether they wished to be excused due to the length of the trial. Tankleff was present at this stage of the screening. The field was thus narrowed to roughly 150 prospective jurors, who were then individually questioned in chambers by the trial judge and attorneys for both the prosecution and defense. These
 
 *247
 
 interviews focused on the potential jurors’ ability to be fair and impartial in light of the media coverage of the case. Tankleff did not attend these interviews, but his trial counsel did and raised no objection to the process. Finally, the jurors who remained after the in-chambers interviews were placed in the jury box and subjected to the usual voir dire, which Tankleff attended.
 

 As an initial matter, the state contends that Tankleff is barred from advancing this claim because he failed to object to the procedure at trial. Tankleff did, however, raise these arguments in his briefs on direct review in the state courts. The Appellate Division rejected the claim without discussion, stating simply, “We have examined the defendant’s remaining contentions and find them to be without merit.”
 
 Tankleff,
 
 606 N.Y.S.2d at 711. Similarly, the Court of Appeals of New York said only, “We have examined defendant’s remaining contentions and find them to be either meritless or unpreserved.”
 
 Tankleff,
 
 622 N.Y.S.2d at 505, 646 N.E.2d 805.
 

 The Supreme Court has held that a procedural default does not bar consideration of a federal claim on habeas review unless the last state court rendering a judgment in the case “clearly and expressly” states that its judgment rests on a state procedural bar.
 
 Coleman v. Thompson,
 
 501 U.S. 722, 735, 111 S.Ct. 2546, 2557, 115 L.Ed.2d 640 (1991) (“In habeas, if the decision of the last state court to which the petitioner presented his federal claims ... did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.”). It is unclear whether the New York Court of Appeals rejected Tankleffs jury selection claim because it was unpre-served or because it was deemed meritless as a matter of federal constitutional law. The Second Circuit may therefore address the claim.
 

 An analytically distinct issue from the procedural bar is whether, as a matter of substantive law, Tankleff waived his right to be present during this particular stage of voir dire. Because the judge discussed the process in open court several times while Tankleff was present, it is reasonable to conclude that Tankleff knew what was going on. There is no indication that he or his lawyers were under the mistaken belief that he could not attend the
 
 in camera
 
 sessions. The far more likely explanation for his absence is that he and his lawyers did not think it was important for him to be present at this tedious, routine screening designed to eliminate jurors who had been prejudiced by pretrial publicity. Under the circumstances, we think waiver may properly be inferred from the conduct of the defendant and his attorneys.
 
 See Hernandez,
 
 873 F.2d at 518 (“The right to be present at one’s trial is ... subject to waiver. A defendant can waive that right expressly, or can do so effectively by failing to appear at trial.”);
 
 Government of the Virgin Islands v. George,
 
 680 F.2d 13, 15 n. 4 (3d Cir.1982) (defendant may “waive his right to be present during the period of often routine voir dire questioning”) (internal quotation marks and citation omitted); see
 
 also United States v. Gagnon,
 
 470 U.S. 522, 528, 105 S.Ct. 1482, 1485, 84 L.Ed.2d 486 (1985) (noting that a district court “need not get an express ‘on the record’ waiver from the defendant for every trial conference which a defendant may have a right to attend”). We, therefore, reject Tankleffs claim that his rights were violated by the pre-screening procedure.
 

 2.
 
 Batson
 
 Challenge
 

 Tankleffs
 
 Batson
 
 claim, on the other hand, has merit. Three African-American jurors remained in the pool after the prescreening process. The government used peremptory challenges to strike the first two. The third black venire member was also initially challenged by the state. But the prosecutor later accepted him as the fourth alternate in order to avoid having to call additional jurors for pre-screening. Tankleffs trial counsel objected to each of these peremptory strikes. The court rejected the defense objections, stating that “[Tankleff] obviously is not black” and therefore could not raise a
 
 Batson
 
 challenge.
 

 The Supreme Court has held, however, that a criminal defendant may object to race-based exclusion of jurors “whether or
 
 *248
 
 not the defendant and the excluded jurors share the same races.”
 
 Powers,
 
 499 U.S at 402, 111 S.Ct. at 1365.
 
 Powers,
 
 moreover, was decided while TanMeffs case was still pending on direct appeal, and therefore applies to his case.
 
 See Griffith v. Kentucky,
 
 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (holding the
 
 Batson
 
 rule applicable to eases pending on direct appeal);
 
 United States v. Stavroulakis,
 
 952 F.2d 686, 697 (2d Cir.1992) (applying
 
 Powers
 
 to case pending on direct appeal).
 

 The district court held that the trial judge’s failure to consider TanMeffs
 
 Batson
 
 claim was “harmless error” because “[b]oth the victims and petitioner are white” and “there was clearly no racial aspect to this case and no reason to assume an illegitimate reason for peremptory challenges.” Harmless error analysis is inappropriate, however, in the case of so-called “structural errors.”
 
 See Arizona v. Fulminante,
 
 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). The Supreme Court distinguished in
 
 Fulminante
 
 between “trial errors,” which are subject to harmless error review, and “structural errors,” which are not. The Court defined trial errors as those “which occurred during the presentation of the case to the jury, and which therefore may be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.”
 
 Id. at
 
 307-08, 111 S.Ct. at 1264. In contrast, structural defects affect “[t]he entire conduct of the trial from beginning to end.”
 
 Id.
 
 at 309, 111 S.Ct. at 1265. Such structural defects were said to include, for example, denial of the right to self-representation and, significantly for our purposes, “unlawful exclusion of members of the defendant’s race from a grand jury.”
 
 Id,
 
 at 310, 111 S.Ct. at 1265.
 

 As the Supreme Court observed in
 
 Batson,
 
 “the basic principles prohibiting exclusion of persons from participation in jury service on account of their race are essentially the same for grand juries and for petit juries.” 476 U.S. 79, 84 n. 3, 106 S.Ct. 1712, 1716 n. 3 (internal quotation marks and citation omitted). Because the effects of racial discrimination during voir dire “may persist through the whole course of the trial proceedings,”
 
 Powers,
 
 499 U.S. at 412, 111 S.Ct. at 1371, we hold that a
 
 Batson/Powers
 
 claim is a structural error that is not subject to harmless error review.
 
 See Ford v. Norris,
 
 67 F.3d 162, 171 (8th Cir.1995) (holding that a “constitutional violation involving the selection of jurors in a racially discriminatory manner is a ‘structural defect’ ... which cannot be subjected to a harmless error analysis.”);
 
 Rosa v. Peters,
 
 36 F.3d 625, 634 n. 17 (7th Cir.1994) (holding that harmless error analysis is inappropriate in a
 
 Powers
 
 case);
 
 Ramseur v. Beyer,
 
 983 F.2d 1215, 1225 n. 6 (3d Cir.1992) (in banc) (“[H]armless error analysis is inappropriate in eases involving discrimination in the jury selection process.”), cer
 
 t. denied,
 
 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).
 

 Assuming that the error is harmless because the defendant is white and there is no racial aspect to the case would perforce vitiate the rule of
 
 Powers
 
 — -that a criminal defendant has third-party standing to raise the equal protection claims of the excluded jurors.
 
 Powers,
 
 499 U.S. at 415, 111 S.Ct. at 1373. Significantly, the Court in
 
 Powers
 
 emphasized that a defendant is injured even when the excluded jurors are of a different race than his own because racial discrimination in jury selection “casts doubt on the integrity of the judicial process and places the fairness of a criminal proceeding in doubt.”
 
 Id.
 
 at 411, 111 S.Ct. at 1371 (citation and internal quotation marks omitted).
 

 Despite the fact that TanMeffs objections were cut off by the state trial court, we believe that he has made out a prima facie case under
 
 Powers
 
 and
 
 Batson.
 
 In
 
 Powers,
 
 the Court observed that it might be more difficult to make out a case of discrimination in situations involving a defendant and venireperson of different races, but declined to elaborate on what showing would be necessary in such eases. Instead, the Court stated that “[i]t remains for the trial courts to develop rules, -without unnecessary disruption of the jury selection process, to permit legitimate and well-founded objections to the use of peremptory challenges as a mask for race prejudice.” 499 U.S. at 416, 111 S.Ct. at 1374.
 

 
 *249
 
 Neither the trial courts nor the courts of appeals have as yet developed clear standards for what prima facie showing is required under
 
 Powers.
 
 In one case, we held that “[reference merely to the race of one excused venireman, without more, is insufficient to raise an inference of discrimination” under
 
 Powers. Stavroulakis,
 
 952 F.2d at 696. We went on to suggest, however, that “[w]hen other factors such as patterns of strikes or lines of questioning combine with race, the inference of discrimination may arise.”
 
 Id.
 
 Courts have used a similar multi-factor analysis in analyzing prima facie showings under
 
 Batson. See, e.g., Turner v. Marshall,
 
 63 F.3d 807, 812 (9th Cir.1995) (“There is no magic number of challenged jurors which shifts the burden to the government to provide a neutral explanation for its actions.”) (quoting
 
 United States v. Chinchilla,
 
 874 F.2d 695, 698 (9th Cir.1989));
 
 United States v. Vasquez-Lopez,
 
 22 F.3d 900, 902 (9th Cir.1994) (the striking of even a single juror based on race violates the constitution, and the court must consider not only the number of minority jurors struck but also the relevant circumstances surrounding the challenges);
 
 United States v. Horsley,
 
 864 F.2d 1543, 1546 (11th Cir.1989) (per curiam) (same).
 

 In considering whether a defendant has made out a prima facie case under
 
 Powers,
 
 we believe that courts should consider how many members of the cognizable racial group are in the venire panel from which the petit jury is chosen, the pattern of strikes against racial group jurors in the particular venire, the prosecutor’s statements and questions during selection, as well as any other relevant circumstances.
 
 See Batson,
 
 476 U.S. at 97, 106 S.Ct. at 1723 (the pattern of strikes and behavior of prosecutor are relevant to a prima facie case);
 
 cf. Jones v. Ryan,
 
 987 F.2d 960, 970-71 (3d Cir.1993) (setting forth a five-factor test for determining when a prima facie case has been established under Batson).
 

 In the case before us, we have little to go on besides the statistics because the trial court cut off defense counsel before he could complete his argument. Nevertheless, the fact that the government tried to strike the only three blacks who were on the panel constitutes a sufficiently dramatic pattern of actions to make out a prima facie case.
 
 [3]
 

 See United States v. Alvarado,
 
 923 F.2d 253, 255-56 (2d Cir.1991) (finding a prima facie case when the prosecution struck four out of seven minority jurors);
 
 see also McCain v. Gramley,
 
 96 F.3d 288, 292 (7th Cir.1996),
 
 cert. denied,
 
 — U.S. ——, 117 S.Ct. 1320, 137 L.Ed.2d 482 (1997) (“[Wjhere there are only a few members of a racial group on the venire panel and one party strikes each one of them,” the inference of discrimination may arise);
 
 Chinchilla,
 
 874 F.2d at 698 & n. 4 (in considering a challenge of two minority jurors, finding significant the fact that
 
 “all
 
 the Hispanic jurors were challenged.”);
 
 cf. Turner,
 
 63 F.3d at 813 (finding a prima facie ease when the prosecution struck five out of nine available minority jurors);
 
 United States v. Battle,
 
 836 F.2d 1084, 1086 (8th Cir.1987) (finding prima facie case when the prosecution struck five out of seven blacks).
 

 Since Tankleff has established a prima facie case, the burden shifts to the government to proffer race-neutral explanations for its use of peremptory challenges.
 
 See Batson,
 
 476 U.S. at 97-98,106 S.Ct. at 1723-24. The court must then determine whether the defendant has established purposeful discrimination in the prosecutor’s use of peremptory challenges. We recognize the difficulty in making such a determination several years after the trial occurred. In the past, this court has noted that “there are cases where the passage of time may impair a trial court’s ability to make a reasoned determina
 
 *250
 
 tion of the prosecutor’s state of mind when the jury was selected. Where such [difficulty] demonstrably exists, there must be a new trial.”
 
 Brown v. Kelly,
 
 973 F.2d 116, 121 (2d Cir.1992). Similarly, the Seventh Circuit noted in one
 
 Batson
 
 case that the passage of six years since the habeas petitioner’s trial meant that a reconstruction hearing to determine whether discrimination had occurred might well be unsatisfactory.
 
 See Rosa,
 
 36 F.3d at 635. The court remanded the ease to the district court, leaving it up to the district judge to decide whether holding a hearing would be productive or whether the defendant should receive a new trial without more.
 
 See id.
 

 In the case before us, the state indicated its willingness, both in its brief and at oral argument, to attend a hearing and come forward with race-neutral reasons for its peremptory challenges. This provides some encouragement that a reconstruction hearing may be a worthwhile exercise. In the past, when we have remanded similar claims to the district court, we have given the district court discretion 1) to apply the correct analysis on the existing record; 2) to develop the record further; or 3) to return the case to the state trial court on a conditional writ of habeas corpus so that the state court could conduct the inquiry on its own.
 
 See, e.g., Howard v. Senkowski,
 
 986 F.2d 24, 30 (2d Cir.1993).
 

 In view of the existence of a prima facie
 
 Batson
 
 violation, we remand the case before us to the district court, so that it may, in its discretion, itself hold a hearing on petitioner’s
 
 Batson
 
 claims or send the case back to state court for such a hearing. Should the district court conclude, however, that the passage of time has made such a reconstruction hearing in either state or federal court unproductive, the court must then rule that defendant is entitled to a new trial.
 

 D. Failure to Disclose
 
 Brady
 
 evidence
 

 Tankleff also maintains that he was prejudiced by the prosecution’s failure to turn over potentially exculpatory evidence as required by
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This duty of disclosure is not limited to evidence of the defendant’s innocence, but includes material information that would assist the defense in the impeachment of key witnesses.
 
 See United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 3380-81, 87 L.Ed.2d 481 (1985). The defense’s theory at trial was that Jerry Steuerman, Seymour Tankleffs former business partner, had killed the Tankleffs and that the police had focused so quickly on Martin Tankleff that they never really investigated Steuerman. After trial, defense counsel discovered that the prosecution was aware of, but had failed to disclose, evidence that twelve years earlier, Steuer-man had hired Hell’s Angels to attack union protestors outside his bagel store. The defense contends that this evidence could have been used for a devastating cross-examination of Steuerman, who when asked if he had anything to do with the murders testified that he would “never do anything like that.” Arguably, hiring Hell’s Angels to settle a union dispute is akin to murdering your business partner. (In addition, the defense claims that this information could also have been used in the cross-examination of Detective MeCready to show that the police investigation of Steuerman was inadequate.)
 

 The defendant need not show by a preponderance of the evidence that disclosure of the evidence would have resulted in his acquittal. Reversal is warranted if there is a “reasonable probability” that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.
 
 Kyles v. Whitley,
 
 514 U.S. 419, 434, 115 S.Ct. 1555, 1565-66, 131 L.Ed.2d 490 (1995). Tankleff has not shown that there is a reasonable probability that this evidence would have changed the outcome of the trial. Steuerman’s credibility was already thoroughly undermined on cross-examination by evidence that he had threatened other people with whom he had business relationships. Moreover, Steuerman’s bizarre behavior right after the murders also called his innocence into doubt.
 
 [4]
 
 Similarly, the defense did
 
 *251
 
 cross-examine Detective McCready at trial regarding his failure to pursue Steuerman as a suspect.
 

 When a witness’s credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a
 
 Brady
 
 claim.
 
 See, e.g., United States v. Zagari,
 
 111 F.3d 307, 320-21 (2d Cir.) (holding that cumulative impeachment evidence was not likely to have changed the outcome of the trial),
 
 cert. denied,
 
 — U.S.-,-, 118 S.Ct. 445, 455, 139 L.Ed.2d 381, 390 (1997);
 
 United States v. Wong,
 
 78 F.3d 73, 79 (2d Cir.1996) (holding that impeachment evidence was not material because witnesses’ credibility had already been called into question by other evidence);
 
 United States v. Aguillar,
 
 387 F.2d 625, 626 (2d Cir.1967) (“The discovery of new evidence which merely discredits a government witness and does not directly contradict the government’s ease ordinarily does not justify the grant of a new trial.”).
 

 There is no reasonable probability that the additional piece of evidence not disclosed by the government would have tipped the jury over to Tankleffs side. The government’s failure to disclose this evidence, standing alone, does not, therefore, warrant reversal.
 

 E. Prosecutor’s Remarks During Summation
 

 Tankleffs final claim is that the prosecution’s bad faith summation references to Tankleffs half-sister’s absence from the defense case violated his due process right to a fair trial. The state’s comments, he argues, impermissibly shifted the burden of proof to the defendant.
 

 During closing argument, the prosecutor said, “Where was the defendant’s sister and brother-in-law from Port Jefferson, Shari and Ron Rother? ... Where were these folks who had regular contact with the Tankleffs and with the defendant? Maybe all was not so well in the paradise the defendant would have you believe was his home.” Once a defendant comes forward with evidence, the prosecution generally may comment on his failure to call an available witness who is under his control and whose testimony may be material.
 
 See, e.g., United States v. Yuzary,
 
 55 F.3d 47, 53 (2d Cir. 1995),
 
 cert. denied,
 
 — U.S.-, 118 S.Ct. 178, 139 L.Ed.2d 119 (1997). Tankleff argues that, because the Rothers were cooperating with the prosecution prior to trial, they were not within his control and that it was therefore improper for the prosecution to make this “missing witness” argument.
 

 The prosecution also commented on Shari’s failure to testify regarding Tankleffs phone call to her on the evening after the murders: “You heard the defendant’s version of his phone call to his sister at 6:37 in the evening. Yesterday you heard what Detective Rein heard. The two are not even close. Dr. Spiegel had even another version. But we’ll get to that. Where’s [Shari,] the other party to that conversation?” The defense argues that this argument was made in bad faith because the prosecution knew that Shari had testified at the suppression hearing that Tankleff had told her that the police “made” him confess—which was consistent with Tankleffs testimony, and not with Detective Rein’s.
 

 Relying on jurors’ testimony at a post-trial evidentiary hearing, Tankleff further argues that the prosecution’s comments had a definite impact on the outcome of the case. During this hearing, a number of jurors acknowledged that the jury had discussed why Shari had not testified, and had even speculated that it was because she thought that Tankleff was guilty.
 

 As a threshold matter, we reject the state’s argument that Tankleff did not exhaust his state remedies on this issue. Prior to closing arguments at trial, defense counsel asked the trial judge “to make sure that there would be no reference to any witness who’s not called by the prosecution.” The court rejected this motion, holding that it would not prohibit the prosecution from mentioning missing witnesses. In addition, the defense objected to both of the prosecutor’s comments relating to Shari
 
 during
 
 closing
 
 *252
 
 argument — even moving for a mistrial — but the court overruled the objections. These issues were also litigated on direct appeal. Indeed, two judges of the Appellate Division would have granted a new trial based on this claim.
 
 See Tankleff,
 
 606 N.Y.S.2d at 712-13 (O’Brien and Eiber,
 
 JJ.,
 
 dissenting). The New York Court of Appeals also addressed the question, concluding that the statements were not improper and were not made in bad faith.
 
 See Tankleff,
 
 622 N.Y.S.2d at 504, 646 N.E.2d 805. While the defense’s explication of this argument may be somewhat more nuanced in the habeas petition, the argument was clearly raised in the state courts and is patently subject to review on habeas.
 

 Our scope of review on habeas is, however, quite limited. In order to grant relief, we would have to find that the prosecutor’s comments constituted more than mere trial error, and were instead so egregious as to violate the defendant’s due process rights.
 
 See Donnelly v. DeChristoforo,
 
 416 U.S. 637, 647-48, 94 S.Ct. 1868, 1873-74, 40 L.Ed.2d 431 (1974);
 
 Floyd v. Meachum,
 
 907 F.2d 347, 353 (2d Cir.1990) (“The appropriate standard of review for a claim of pros-ecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.”) (internal quotation marks and citations omitted). To be entitled to relief, Tankleff must show “that he suffered actual prejudice because the prosecutor’s comments during summation had a substantial and injurious effect or influence in determining the jury’s verdict.”
 
 Bentley v. Scully,
 
 41 F.3d 818, 823 (2d Cir.1994) (internal quotation marks and citation omitted).
 

 In deciding whether a defendant has suffered actual prejudice as a result of the prosecutorial misconduct, we have considered “the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.”
 
 Floyd,
 
 907 F.2d at 355 (quoting
 
 United States v. Modica,
 
 663 F.2d 1173, 1181 (2d Cir.1981) (per curiam)) (internal quotation marks omitted);
 
 accord United States v. Parker,
 
 903 F.2d 91, 98 (2d Cir. 1990). For example, in
 
 United States v. Parker,
 
 we looked to these factors and then upheld the defendant’s conviction despite the prosecutor’s improper reference to the defendant’s failure to call (in a curious parallel to the case before us) his sister as a witness. We noted that the prosecution’s conduct did not evidence bad faith, that the trial court’s instructions had a substantial curative effect, and that the strong evidence of guilt made it highly probable that the jury would have convicted the defendant regardless of the prosecutor’s comments.
 
 See Parker,
 
 903 F.2d at 99. In
 
 Floyd v. Meachum,
 
 on the other hand, we granted habeas relief to the petitioner, observing that the prosecutorial misconduct was severe, the corrective measures taken by the trial court were inadequate, and it was “by no means clear or even probable that appellant would have been convicted absent the prosecutor’s misconduct.”
 
 Floyd,
 
 907 F.2d at 356 (internal quotation marks and citations omitted).
 

 With respect to the severity of the prose-cutorial misconduct, we find that the two statements to which Tankleff objects were clearly improper. The prosecutor’s second improper comment is particularly troubling. The prosecutor remarked on Shari’s failure to testify regarding Tankleffs phone call to her on the evening after the murders, suggesting that, if Shari had testified regarding the phone call, her testimony would have conflicted with Tankleffs account of the phone call and supported Detective Rein’s version. In fact, Shari’s testimony under oath at the pretrial suppression hearing — of which thé prosecution was fully aware — corroborated Tankleffs description of the phone call.
 

 Relying on
 
 Parker,
 
 the government contends that it was not improper for the prosecutor to disregard Shari’s testimony at the suppression hearing in making this argument. In
 
 Parker,
 
 we held that the government did not act in bad faith in refusing to credit the story given by a witness in an unsworn interview with the police. But we emphasized that the
 
 Parker
 
 witness’ pretrial statement was unsworn, and noted that the government was not required “to believe that she would have repeated it under oath.” 903 F.2d at 99. In contrast, Shari’s testimony at the suppression hearing was given under
 
 *253
 
 oath, and we have held that the prosecution is not allowed to ignore
 
 sworn
 
 testimony. We have stated, for example, that “[t]he government cannot properly, either explicitly or implicitly, mischaracterize the substance of grand jury testimony,” which is given under oath.
 
 United States v. Valentine,
 
 820 F.2d 565, 570 (2d Cir.1987). And in
 
 Valentine,
 
 we held that it was a due process violation for the prosecutor to suggest that certain witnesses, who had not testified at trial but who had testified before the grand jury, supported the government’s theory of the case, when in fact their testimony before the grand jury did not. We stated that this “violated the due process prohibition against a prosecutor’s making ‘knowing use of false evidence,’ including by misrepresenting the nature of nontestimonial evidence.”
 
 Id.
 
 (citation omitted);
 
 cf. United States v. Rosa,
 
 17 F.3d 1531, 1548-49 (2d Cir.1994) (“It is clear, of course, that it is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts not in evidence.”). It is at least arguable that, in the ease before us, the prosecution did precisely what we prohibited in
 
 Valentine;
 
 that is, that its mischaracterization went well beyond any “missing witness” problem.
 

 Nevertheless, we are also mindful that the prosecutor’s comments were short and fleeting, and thus much less likely to have had a substantial effect on the jury’s verdict.
 
 Cf. Bentley,
 
 41 F.3d at 825 (denying habeas relief where “prosecutor’s summation comments were both brief and isolated.”). By contrast, the prosecutor in
 
 Floyd
 
 made improper comments “literally dozens of times throughout her opening and closing summations.” 907 F.2d at 348. In granting habeas relief in that case, we noted that it was “one of those rare cases where the improper comments in a prosecutor’s summation were so numerous and, in combination, so prejudicial that a new trial is required.”
 
 Id.
 
 With respect to the first factor, therefore, we conclude that the severity of the prosecutor’s misconduct in Tankleffs case was mitigated by the brevity and fleeting nature of the improper comments.
 

 In addition, the trial judge instructed the jury that the burden of proof always rests with the prosecution and that the attorneys’ arguments on summation are not evidence and, therefore, that the jury should not base its verdict on them. The defense requested a more specific curative instruction, and it was error for the trial court to refuse to give one.
 
 Cf. Floyd,
 
 907 F.2d at 355 (“[T]he only arguably curative measure adopted by the trial judge — the normal instruction in the course of his charge that argument of counsel is not evidence — was inadequate.”);
 
 Módica,
 
 663 F.2d at 1182 (“The court’s pattern instruction to the jury — that the arguments of counsel are not to be considered evidence — was proper, but was an insufficient response to the prosecutor’s conduct.”). However, looking at all the circumstances, we conclude that the standard instructions given by the trial court were probably sufficient to cure any harm that the prosecutor’s misstatements may have caused.
 

 Finally, we are not prepared to say that this is a case in which the evidence was so closely balanced that the prosecutor’s comments were likely to have had a substantial effect on the jury.
 
 Cf. United States v. Saa,
 
 859 F.2d 1067, 1077 (2d Cir.1988) (“[B]ased on the other evidence against [the defendants], we find ... that any adverse inference improperly drawn by the jury would not have tilted the scales from not guilty to guilty.”). The fact that the jurors discussed Shari’s non-appearance does not convince us otherwise. Her failure to testify in regard to the phone conversation with the defendant— a conversation about which two other parties, including the defendant, had testified — was bound to be a source of some interest to the jurors regardless of the prosecutor’s comments. Moreover, the jurors indicated that their discussion of Shari’s absence was brief, and that they knew that the state could also have called her as a witness, but failed to do so. Finally, they did not suggest that it in any way influenced their verdict.
 

 Accordingly, we conclude that Tankleff has not met his burden of showing that he was substantially prejudiced by these, admittedly improper, comments.
 

 III. CONCLUSION
 

 We have considered all of Tankleffs claims carefully and, while we find that several of
 
 *254
 
 the issues are close and far from free of difficulty, we nevertheless conclude that Tankleff is not entitled to federal habeas relief on any of them except for the
 
 Batson
 
 claim. The judgment below is, therefore, affirmed in part and reversed in part and the ease is remanded to the district court for further proceedings consistent with this opinion.
 

 [1]
 

 . As noted above, since Tankleffs petition was filed before the effective date of the AEDPA, we evaluate his claims under pre-AEDPA case law and standards.
 
 See Lindh v. Murphy,
 
 --U.S. -. -. 117 S.Ct. 2059. 2068. 138 L.Ed.2d 481 (1997) (holding that the changes under AED-PA to 28 U.S.C. § 2254(d) do not apply retroactively to cases pending before AEDPA’s effective date).
 

 [2]
 

 . In this respect,
 
 Elstad
 
 was a relatively easy case. In
 
 Elstad,
 
 the Court noted:
 

 Neither the environment nor the manner of either ‘interrogation’ was coercive. The initial conversation took place at midday, in the living room area of respondent’s own home, with his mother in the kitchen area, a few steps away. Although in retrospect the officers testified that respondent was then in custody, at the time he made his statement he had not been informed that he was under arrest.
 

 470 U.S. at 315, 105 S.Ct. at 1296. And the court concluded, ”[w]hatever the reason for the [the police officer's] oversight” in failing to administer the
 
 Miranda
 
 warnings earlier, "the incident had none of the earmarks of coercion.”
 
 Id.
 
 at 316, 105 S.Ct. at 1296.
 

 [3]
 

 . In addition, the defense has put forward an argument for why the prosecution might have stricken jurors on the basis of race, despite the fact that the defendant was white and there was no racial aspect to the case. A pivotal issue at trial was the credibility of the police officers concerning Tankleff's confession. And, the defense argues, there is a belief in certain parts of our society that African Americans are less likely te trust the police than are whites. Such a stereotype may or may not exist (the record does not speak to the issue), but we note that "to say that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes and may manifest itself in different forms.”
 
 Powers,
 
 499 U.S. at 416, ill S.Ct. at 1374.
 

 [4]
 

 . One week after the attacks, Steuerman withdrew money from the bank account he shared with Seymour Tankleff, faked his own death, and disappeared. He was subsequently found living
 
 *251
 
 under an alias in California, having also changed his appearance by shaving his beard.