Bryan A. SINGLETON, Petitioner–
Appellant,

v.

Harold E. CARTER, Warden,
Respondent–Appellee.

No. 02–3272.

United States Court of Appeals,
Sixth Circuit.

Aug. 26, 2003.

Gary W. Crim, Dayton, OH, for Petitioner–Appellant.

Scott M. Criss, Office of the Attorney General, Columbus, OH, for Respondent–Appellee.

Before DAUGHTREY, MOORE, and SUTTON, Circuit Judges.

## OPINION

MOORE, Circuit Judge.

The petitioner Bryan A. Singleton ("Singleton") appeals the district court's judgment denying his petition for a writ of habeas corpus. Singleton was convicted in an Ohio state court by a three-judge panel of murdering Margaret T. Chain and was given a life sentence. His conviction was affirmed by the Ohio Court of Appeals and was not reviewed by the Ohio Supreme Court.

Singleton's habeas petition raises only one issue, which is his claim that the state court erred in denying his motion to suppress a set of confessions he made during the course of a police interview. For the reasons that follow, we AFFIRM the decision of the district court, and deny Singleton's petition for a writ of habeas corpus.

## I. BACKGROUND

Early in the morning of April 3, 1997, Jacob Agee and the petitioner Bryan Singleton entered a Sunoco store. While there, Singleton shot and killed Margaret Chain, the store manager. Singleton and Agee took some money from the store and fled.

These facts were unknown to the police when they began their investigation of Chain's death. By the next morning, the morning of April 4, 1997, the police suspected Agee of committing the crime and were looking for him. At 10:45 a.m., Detective Kendall Wills, whose son happened to be a friend of Singleton, stopped at Singleton's residence to pick up witness-statement forms from Singleton's parents. Singleton's mother gave Wills the witness-statement forms and told him that Singleton was not there. Wills asked her to have Singleton contact him.

At 11:30 a.m., Singleton called Wills and asked Wills when he should come in to the police station. Wills asked how soon Singleton could arrive. Singleton said that he needed to shower, but that he could be at the police station by 12:30 p.m. Wills testified that the police were interested in Singleton at this time only because he may have known something about Agee's role in the crime; Singleton, at this point, apparently was a potential witness, not a suspected participant.

At 12:30 p.m., Singleton arrived at the police station with his mother, Leslie Mooneyham, and his stepfather, Rick Mooneyham. Singleton and his parents waited in the lobby until 12:45 p.m., when the three were moved into a large conference room by Detective Matthew Moore. Moore left the room to attend to other matters and came back with Detective Comer at roughly 1:00 p.m., at which point the interview began.

The interview was taped (as were the other two dozen witness interviews taken in conjunction with the Chain homicide). Detective Comer began the interview by telling Singleton that his presence was

strictly voluntary and that he was not under arrest. Singleton signaled that he understood these points. During the conversation that ensued, the detectives evidently told Singleton that Agee could perhaps point to Singleton as having pulled the trigger. Apparently, the detectives also told Singleton that they had enough information to place him in custody, if they so desired, but that they were at this point only trying to gather information.[1] At this point, Singleton denied any role in the homicide. The officers concluded the interview, turned off the tape recorder, and left to get witness statements for Singleton to fill out.

When the officers returned to the room, Singleton and his parents were crying. Rick Mooneyham, Singleton's stepfather, told Detective Moore that Singleton wanted to talk alone to the detectives. The Mooneyhams then left the conference room. As they were leaving, Rick Mooneyham told Singleton to tell the police everything.

As Detectives Comer and Moore reentered the room, they turned the tape player on. Detective Moore again said that Singleton's statements would be voluntary and that Singleton was not in custody. Before any questions could be put to him, Singleton suddenly stated he had been lying to the detectives and that "me and Jacob robbed the store and I pulled the trigger." J.A. at 369 (Supp. Hr'g Test. of Det. Moore). This confession, which we will refer to as Singleton's "initial confession," happened at around 1:34 p.m.

After this initial confession, the interview continued. Singleton was asked more questions and was not given *Miranda* warnings. According to Singleton's brief, the detectives got Singleton to explain in detail how Singleton and Agee committed the robbery. Singleton also told them that he and Agee were intoxicated at the time of the homicide, that it was Agee's gun that was used in the homicide, that Agee gave Singleton the gun shortly before they entered the Sunoco station, and that Singleton had a problem with drinking. Appellant Br. at 23.[2]

At around 1:40 p.m., Detective Moore heard Singleton's mother crying outside the room. Moore left the interview to try to calm her down. When Moore returned, Singleton asked for a cigarette break. Moore and Comer went with Singleton outside and asked him a few more questions. In response to their questions, Singleton told them where to find the gun used in the homicide.

At around 2:10 p.m., Moore took Singleton back to Moore's office. Singleton ordered lunch and had casual conversation with a secretary whose children knew Singleton. Singleton was then moved to the conference room where he had been interviewed earlier. He was next read his rights and signed a written waiver of them. Singleton does not allege that the waiver was incomplete or invalid. Singleton then gave a statement, which explained the details of the crime, and provided the location of the gun used in the homicide as

1. The transcript of the interview is neither in the joint appendix nor in the district court's record. Although audio cassettes of the interrogation and a written transcription of the audio cassettes were admitted in the state courts, neither party introduced them in the court below.

   Our characterization of what was said during this segment of the interview is taken

from Singleton's briefs. The government does not claim that Singleton has either misrepresented the transcript or portrayed its contents selectively.

2. Again, these characterizations of what was said are taken from Singleton's brief, because neither party submitted the written transcript of the interrogation to the district court.

well as the location of Singleton's blood-soaked clothes. Around 3:00 p.m. this portion of the interview ended, although Singleton was interviewed repeatedly until around 7:50 p.m., when he was transferred to the county jail. Singleton never asked for an attorney, requested that the questioning cease, or was physically restrained (until the transfer to the county jail).

All of these facts were adduced at the suppression hearing. The state court of common pleas found all of Singleton's statements admissible; later a three-judge panel of the court found Singleton guilty of murdering Chain. On appeal, the Ohio Court of Appeals disagreed with part of the trial court's reasoning regarding the suppression issue, although it affirmed Singleton's conviction and his sentence. Although it found admissible the statements that Singleton made before and during his initial confession, the Ohio Court of Appeals determined that once Singleton stated that he was the one who pulled the trigger, he was in police custody and should have been read his *Miranda* rights. Because Singleton was not read his rights, the statements he made after his initial confession but before he received *Miranda* warnings should have been suppressed by the trial court. Nevertheless, the Ohio Court of Appeals found that the error that the trial court made in admitting these statements was harmless beyond a reasonable doubt. Finally, the Ohio Court of Appeals found no error in the admission of the statements Singleton gave after he received his *Miranda* warnings. The Ohio Supreme Court did not grant review of Singleton's case.

The district court denied Singleton's petition for a writ of habeas corpus on the basis of the magistrate judge's report and recommendations. The magistrate judge had concluded that the state courts were not objectively unreasonable in holding that Singleton's statements prior to and during his initial confession were admissible because Singleton was not in custody at that time, that Singleton's statements received after he received *Miranda* warnings were admissible because Singleton had properly been read (and had validly waived) his rights, and that the error in admitting Singleton's intervening statements was harmless.

## II. ANALYSIS

### A. Standards of Review

This court reviews the legal conclusions of a district court denying habeas relief de novo. *Palazzolo v. Gorcyca,* 244 F.3d 512, 515 (6th Cir.), *cert. denied,* 534 U.S. 828, 122 S.Ct. 68, 151 L.Ed.2d 35 (2001). Because the district court below did not hold an evidentiary hearing, we also review its factual findings de novo. *Northrop v. Trippett,* 265 F.3d 372, 377 (6th Cir.2001), *cert. denied,* 535 U.S. 955, 122 S.Ct. 1358, 152 L.Ed.2d 354 (2002). As Singleton's habeas petition was filed on August 1, 2000, it is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to AEDPA, relief is only available with respect to claims adjudicated on the merits in state court if the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Moreover, the factual findings of a state court are presumed to be correct and can only be rebut-

ted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The presumption of correctness also attaches to the factual findings of a state appellate court based on the state trial record. *See Sumner v. Mata*, 449 U.S. 539, 546–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

On collateral review, not only do we review deferentially a state court's determination that there was no constitutional error, but also we extend deference to the determination of a state court that an error is harmless. Instead of granting relief for all errors except those that are "harmless beyond a reasonable doubt" under *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), relief is available only where the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*. 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quotation omitted). Although the *Brecht* decision predated AEDPA, it still governs habeas cases after AEDPA. *See Nevers v. Killinger*, 169 F.3d 352, 371 (6th Cir.) (explaining that *"Brecht'*s [deferential standard] quite precisely captures Congress's intent as expressed in AEDPA and, therefore, continues to be applicable"), *cert. denied*, 527 U.S. 1004, 119 S.Ct. 2340, 144 L.Ed.2d 237 (1999). This standard not only applies to our analysis of state-court determinations that a particular error was harmless, but also to any errors that we are the first court to find. *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir.1999), *cert. denied*, 528 U.S. 1120, 120 S.Ct. 945, 145 L.Ed.2d 821 (2000). Under the *Brecht* standard, the burden falls on the habeas petitioner to show that the trial error resulted in actual prejudice. *Nevers*, 169 F.3d at 371.

### B. Summary of Claims of Error

For ease of analysis, we divide Singleton's statements into three categories (as did the state courts and the district court). The first category includes the statements Singleton made prior to and during his initial confession, which occurred at roughly 1:34 p.m. No *Miranda* warnings had been given before his initial confession, but the Ohio Court of Appeals found no error in the detectives' actions because it found that the interrogation was noncustodial. The second category involves the statements Singleton made after the initial confession but before he was given *Miranda* warnings at roughly 2:30 p.m. The Ohio Court of Appeals found that although these statements should have been suppressed, it was harmless error for them to be admitted. The third category includes the statements Singleton made after receiving *Miranda* warnings and signing a written waiver. The Ohio Court of Appeals found that these statements were admissible.

Singleton's allegations of error can be sorted through this taxonomy of statements. With respect to the first set of statements, Singleton claims he was in custody when questioning began at the police station and that his statements should therefore have been suppressed. As for the second set, Singleton claims that the error in their admission was not harmless and actually prejudiced him. And regarding the third set, Singleton claims that these statements also should have been suppressed because his subsequent confessions should be treated as poisoned fruit of the police's failure to give him *Miranda* warnings earlier.

### C. Singleton's Statements Prior to and During His Initial Confession

■ Singleton's first claim is that the statements he made to the police leading up to and including his initial confession should have been suppressed because he

was in custody of the police as soon as detectives began to interview him. We hold that Singleton was not in custody, however, at the time these statements were made, and so we reject his claim of error regarding this first set of statements.

Under the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), not all interrogations need to be immunized by *Miranda* warnings. Constitutional warnings are only needed in cases of "custodial interrogations," which the Supreme Court explained to be cases of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. 1602. "[I]n the absence of any formal arrest or restraint on freedom of movement," custody is not established simply because the questioning "took place in a 'coercive environment,'" such as a police station. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (holding an interrogation to be noncustodial when the defendant voluntarily came to the police station, was informed he was not under arrest, and left after a half an hour); *see also California v. Beheler*, 463 U.S. 1121, 1126, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (holding noncustodial a similar interrogation, which also involved a suspect who voluntarily came to the police station. was told he was not under arrest, and left after a half an hour).

We cannot help but note the presence of three facts in this case that make it virtually indistinguishable from *Mathiason* and *Beheler*. First, Singleton voluntarily came into the police station for questioning. Second, Detective Comer apparently prefaced the interview by asking. "'Bryan, you understand that this is strictly voluntary and you are not under arrest at this time.'" J.A. at 360 (Supp. Hr'g Test. of Det. Moore). In response, Singleton acknowledged that he was willing to talk to the police, that he was not under arrest, and that any statements he made would be voluntary. Third, at the time Singleton initially confessed, the interview had lasted roughly half an hour; the interview began at 1:00 p.m., and Singleton's spontaneous confession occurred at around 1:34 p.m. Similar facts formed the basis upon which the Supreme Court held that custody was not established in both *Mathiason* and *Beheler*, where the Court summarily reversed findings of custody.

In support of his claim of custody, Singleton points to the facts that he did not leave the interrogation room when his mother was in distress outside and that he had to ask permission to go outside to smoke.[3] Singleton also points to statements by the detectives to him that he was

---

3. To support his suppression claim in the state court of common pleas, Singleton introduced an arrest-custody form that listed 12:30 p.m. as the time he was taken into custody. Nevertheless, the state courts found that the arrest-custody form was not reliable on this point. J.A. at 158 (Ohio Ct. of App. Op.) ("Although Defendant's Exhibit A indicates that the time of "arrest/custody" was 12:30, the facts are clear that the Defendant was not in custody at that time.) (quoting J.A. at 257 (Ohio Tr. Ct.Op.)).

Singleton has offered no evidence to rebut the presumed correctness of this factual finding, which is supported by Detective Moore's testimony at the suppression hearing. Detective Moore noted that Singleton did not even arrive at the police station until 12:30 p.m., and that Singleton's interview did not commence until 1:00 p.m. Moore further explained that the arrest form would not have been expected to be accurate on this point; the arrest form was for internal purposes only, contained a number of other errors, and was likely created weeks after the actual interview.

not at the police station accidentally and that there was sufficient evidence to place him in custody. Appellant Br. at 6, 8. These arguments, however, are insufficient to establish custody. First, although Singleton claims that he was not free to see his mother and that he had to ask permission to go outside to smoke, there is no evidence that he was restrained in any way from exiting the interview to check on his mother or to smoke. The Ohio Court of Appeals found. in fact. that "Singleton never asked to leave the conference room to attend to his mother." J.A. at 166 (Ohio Ct. of App. Op.). All of the evidence suggests that Singleton was entirely free to leave the questioning at this time. Second, any statements made by the detectives to the effect that they may have had sufficient evidence to place Singleton in custody are tempered by the detectives' repeated explanations to Singleton that he was not actually in custody at that time and that the detectives were not going to take him into custody because they were seeking only to gather information. In light of these facts, we hold that the state court's determination that Singleton was not in custody at the time of his initial confession was not an unreasonable application of clearly established federal law.

### D. Singleton's Statements Made After Receiving *Miranda* Warnings

█ We next consider Singleton's claim regarding the third set of statements – the statements he made after receiving *Miranda* warnings at approximately 2:30 p.m. Singleton argues that these statements were "poisonous fruits" of the police's failure to give *Miranda* warnings before Singleton's first and second set of statements. As we explain below, however, the statements that Singleton made after receiving his *Miranda* warnings were voluntarily and knowingly made and thus were admissible under Supreme Court precedent.

We therefore dismiss this contention of error.

In the Fourth Amendment context, evidence found in a subsequent search that is derived from an earlier illegal search or seizure is itself inadmissible under the well-established fruit-of-the-poisonous-tree doctrine. *See Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). This rule, however, has very limited application in the *Miranda* context because of the Supreme Court's decision in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad*, the Court held that because the rights protected by *Miranda* were not constitutional in nature, the fruit-of-the-poisonous-tree doctrine did not apply. *Id.* at 305, 105 S.Ct. 1285 (holding that the " 'fruit of the poisonous tree' [doctrine] assumes the existence of a constitutional violation"). The Supreme Court explained further:

> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309, 105 S.Ct. 1285. Under *Elstad*, if a defendant's initial confession is voluntary but unwarned, a later derivative con-

fession is not poisoned by the first's unwarned nature; the later confession is admissible if it itself is voluntary.[4] *Cf. United States v. Crowder*, 62 F.3d 782, 786 (6th Cir.1995) (explaining that "[a] suspect's warned confession, given after he made unwarned and inculpatory statements, is admissible if the unwarned statements were voluntary"), *cert. denied.* 516 U.S. 1057, 116 S.Ct. 731, 133 L.Ed.2d 682 (1996). In fact, a later voluntary confession can remain unpoisoned even in some circumstances where the earlier unwarned confession was not voluntary. *See Elstad*, 470 U.S. at 310, 105 S.Ct. 1285; *see also Crowder*, 62 F.3d at 786 n. 1.

In this case, the statements Singleton made after he received *Miranda* warnings were voluntary. The only uncertainty has to do with Singleton's earlier unwarned

statements – the statements he made after his initial confession, but before he received *Miranda* warnings.[5] After reflection, we believe that these initial statements were also voluntary.

Of course, in determining whether these earlier unwarned statements were voluntary, we cannot rely too heavily on the fact that no *Miranda* warnings were yet given or that Singleton may have been in custody at this time, for this is true of all cases where *Elstad* could potentially apply.[6] *See Tankleff v. Senkowski*, 135 F.3d 235, 244–45 (2d Cir.1998) (noting that "in any case under *Elstad* ... a defendant was in custody and [was] entitled to *Miranda* warnings at some point before those warnings were given" and so "we cannot rely solely on the *Miranda* presumption that custodial interrogation is coercive in determining wheth-

---

4. In *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Supreme Court held that *Miranda* was a constitutional, rather than merely prophylactic, rule. This would seem to alter the decision in *Elstad*, which was premised on a distinction between technical *Miranda* violations (which would not trigger the application of the fruit-of-the-poisonous-tree doctrine) and actual violations of the Fifth Amendment (which would) – a distinction that now no longer appears to exist. Nonetheless, the Supreme Court in *Dickerson* retained *Elstad*, based upon the differences between the Fourth and Fifth Amendments. *Id.* at 441, 120 S.Ct. 2326 ("Our decision in [*Elstad*] ... simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment."); *but see United States v. Orso*, 266 F.3d 1030, 1034 n. 3 (9th Cir.2001) (stating that, after *Dickerson*, "[i]t has become an interesting question to ask why, exactly, the 'fruit of the poisonous tree' doctrine does not operate in the *Miranda* context in the same way it does in the Fourth Amendment context"), *cert. denied*, 537 U.S. 828, 123 S.Ct. 125, 154 L.Ed.2d 42 (2002).

5. There is no need to consider the statements Singleton made prior to and during his initial confession, because we have already estab-

lished that Singleton was not in custody at this time and therefore warnings were not required.

6. Note that we assume that Singleton was in custody immediately after his initial confession. Singleton stresses that there was testimony at the suppression hearing that, after that confession, the police "probably would not have permitted him to leave." J.A. at 411 (Supp. Hr'g Test. of Det. Moore). We understand, of course, that "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). We also understand that whether a reasonable person in Singleton's position would have felt free to leave is only one of the factors used to determine whether Singleton was in custody. *See United States v. Crossley*, 224 F.3d 847, 861 (6th Cir.2000) (listing other factors).

We will assume, however, for the sake of argument, that Singleton was in police custody after making his initial confession. Even taking this point in Singleton's favor, his claim for relief is still not meritorious.

er Tankleff's second confession must be suppressed"); *see also Crowder*, 62 F.3d at 788 ("We would create a Catch–22 were we to hold that, although a *Miranda* violation alone does not require the exclusion of evidence obtained as a result, a *Miranda* violation alone does demonstrate sufficient coercion to require such an exclusion.").

To understand the Supreme Court's conception of voluntariness in this context, the facts of *Elstad* are worth noting. In *Elstad*, the officers picked up Elstad at his home as a suspect in a burglary with a warrant for his arrest. While Elstad was in the living room, the officers asked if he knew about a man named Gross. Elstad said he did. One of the officers stated suggestively that he thought Elstad was involved in the burglary at the Gross residence, to which Elstad responded, "Yes, I was there." *Elstad*, 470 U.S. at 301, 105 S.Ct. 1285. Having made these initial and unwarned inculpatory statements, Elstad was taken to the police station, where he was read his rights. Elstad then gave a full statement of how he went about burglarizing the Gross residence. The Supreme Court assumed that Elstad's first statement – the one made in his home – was inadmissible because it was the product of a custodial interrogation that took place without *Miranda* warnings. The statements he made in police custody, however, were held to be admissible because "the incident [at Elstad's house] had none of the earmarks of coercion." *Id.* at 316, 105 S.Ct. 1285.

Under *Elstad*, the statements Singleton made after his initial confession were voluntary even though they were unwarned. As was the case in *Elstad*, there are no "earmarks of coercion" present here. Singleton entered into the police station voluntarily and with his parents, J.A. at 352 (Supp. Hr'g Test. of Det. Moore), was told repeatedly that he could leave, J.A. at 360,

367, had complete freedom of movement, J.A. at 363–64, arranged for his parents to leave the room, J.A. at 364–65, spontaneously confessed to the police. J.A. at 368–69, and then chose to continue answering more questions. J.A. at 369. There is no evidence that the statements that Singleton made following his initial confession, but before receiving *Miranda* warnings, were involuntary. *Cf. United States v. Short*, 790 F.2d 464, 468–69 (6th Cir.1986) (finding an initial interrogation involuntary under *Elstad* when the defendant had a deficient understanding of English, she was unfamiliar with the American criminal justice system, and the prosecution even admitted that it was unclear whether the defendant understood that she was implicating herself). Because these unwarned statements were voluntary, under *Elstad* Singleton's subsequent voluntary confession (made after receiving *Miranda* warnings) was admissible. We therefore cannot say that the Ohio Court of Appeals's decision holding these statements admissible was an unreasonable application of clearly established federal law.

E. Singleton's Statements Made After His Initial Confession But Before Receiving *Miranda* Warnings

■ Singleton's last claim is that the Ohio Court of Appeals erred in its analysis of the admissibility of Singleton's statements that were made after his initial confession, but before the *Miranda* warnings were given. The Ohio Court of Appeals determined that the admission of these statements was error, because they were made before *Miranda* warnings were given but after Singleton was deemed to be within custody. The Ohio Court of Appeals held, however, that this error was harmless beyond a reasonable doubt.

Given our analysis above, however, it is almost impossible for the trial court's error

in admitting these intervening statements to be anything other than harmless. We have also explained why Singleton's extended confession, made after he received *Miranda* warnings, was admissible under *Elstad.* Given that these two confessions were both admissible, Singleton cannot show, as he must, actual prejudice in the admission of these additional self-incriminating statements made after his initial confession but before he was given *Miranda* warnings. Singleton claims that these intervening statements were critical; he argues in his brief that it was during this period that he admitted that he and Agee were intoxicated at the time of the homicide, that the idea to commit the robbery came from Agee, that Agee brought the weapon used in the homicide and gave it to Singleton, and that Singleton had a problem with alcohol. Appellant Br. at 23. Nevertheless, the confession that Singleton gave after receiving *Miranda* warnings provided substantially the same information, including a detailed description of the homicide as well as the location of Singleton's blood-soaked clothes and the gun used in the homicide. J.A. at 383–85 (Supp. Hr'g Test. of Det. Moore). This later admissible and detailed confession certainly would have provided enough information to convict Singleton, and so the potentially erroneous admission of Singleton's earlier statements cannot be said to have "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (quotation omitted); *cf. Tankleff,* 135 F.3d at 245 ("The court should, nonetheless, have suppressed Tankleff's inculpatory pre-*Miranda* statements. Since those statements were, however, brief and substantially the same as some of his later, admissible confession, this error was harmless beyond a reasonable doubt."). We therefore reject Singleton's last claim of error.

### III.   CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of the writ of habeas corpus.