Leon DUNCAN, Petitioner,

v.

Brian FISCHER, Superintendent, Sing Sing Correctional Facility, Respondent.

CV–03–6218 (NG).

United States District Court, E.D. New York.

Jan. 19, 2006.

Leon Duncan, Ossining, NY, pro se.

Kings County District Attorneys Office, Anne Covingman Feigus, Office of the District Attorney, Brooklyn, NY, for Respondent.

### REPORT AND RECOMMENDATION

GOLD, United States Magistrate Judge.

#### Introduction

On June 5, 1999, Julia Guy was strangled to death in her Brooklyn apartment. Her body was then wrapped in a black garbage bag, placed in a shopping cart and taken to a vacant lot, where it was dumped. Ms. Guy, who was known by the name "Terry," was the common-law wife of petitioner Leon Duncan. On June 9, Duncan reported to the police that Ms. Guy was missing. Two days later, Duncan admitted in response to police questioning that he had killed Ms. Guy by choking her with his bare hands, but claimed that Guy had been attacking him with a baseball bat at the time and that he was acting in self-defense.

Following a jury trial, Duncan was found guilty of Manslaughter in the First Degree in violation of New York Penal Law § 125.20. On March 9, 2000, Duncan was sentenced as a second violent felony offender to a determinate term of imprisonment of 20 years. The verdict was affirmed by the Appellate Division, Second

Department, on June 17, 2002. *People v. Duncan*, 295 A.D.2d 533, 744 N.Y.S.2d 444 (2d Dep't 2002). On October 3, 2002, the New York Court of Appeals denied petitioner leave to appeal. *People v. Duncan*, 98 N.Y.2d 767, 752 N.Y.S.2d 7, 781 N.E.2d 919 (2002).

On December 5, 2003, Duncan filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 with this Court. The Honorable Nina Gershon referred the petition to me for report and recommendation. *See* Docket Entry 3. For the reasons stated below, I respectfully recommend that Duncan's petition be denied.

### The Evidence at the Suppression Hearing and at Trial

Duncan's first claim is that he was interrogated while in police custody without first being advised of his *Miranda* rights, and that admissions he made under those circumstances—and in response to further interrogation after receiving *Miranda* warnings—were received in evidence against him in violation of his Fifth Amendment rights. Duncan moved to suppress his post-arrest statement prior to trial. The state trial court denied the motion after holding a suppression hearing. Duncan's Fifth Amendment claim depends upon the facts developed at the suppression hearing, and those facts are set forth in detail below. The evidence presented at Duncan's trial is summarized as well.

### A. The Evidence Presented at the Suppression Hearing

Detectives Warren Bond and John Bruton testified at the suppression hearing. The trial court found their testimony credible. SH Tr. 105.[1] The facts recounted below are drawn from their hearing testimony.

New York City police officers recovered a body from a vacant lot on the night of June 10, 1999. The body was identified as the corpse of Julia Guy the next morning. SH Tr. 10. Because petitioner Duncan had reported Guy missing, Detectives Bond and Bruton went to Duncan's home at about 6:30 p.m. on June 11, 1999, and asked Duncan to accompany them to the police precinct. Duncan, who was not a suspect at that time, agreed. SH Tr. 9–11, 80.

Once they arrived at the precinct, the detectives brought Duncan to an interview room and started questioning him, but did not make Duncan aware that they had recovered Guy's body or that they knew she was dead. SH Tr. 32–33. Shortly after Duncan began speaking with the detectives, he told them that he last saw Guy when they were shopping together and that he had receipts at home from their shopping trip. SH Tr. 11–12, 35–36. At about 7:00 p.m., the detectives and Duncan went together to Duncan's apartment to retrieve the receipts and then returned to the police station. SH Tr. 12, 35–36, 80–81. However, when the detectives examined the receipts, they saw that they reflected purchases made on June 7, while Duncan had said that he last saw Guy when they were shopping together on June 3 or 4. When confronted with this discrepancy, Duncan suggested that he must have taken the wrong receipts, so the detectives and Duncan returned for a second time to Duncan's apartment, where Duncan retrieved a box filled with various papers, including a calendar. SH Tr. 12–13, 37–38, 82.

---

1. "SH Tr." refers to the transcript of the suppression hearing held by the state court on February 3, 2000. *See* Respondent's Ex. A,

Part 1. "Tr." refers to the transcript of Duncan's state court trial. *See* Respondent's Ex. A, Parts 2–6.

Although Duncan examined the newly retrieved papers after returning to the police station, he was unable to find any receipts from the shopping trip he had described. SH Tr. 13, 38–39. At approximately 8:45 p.m., the detectives left the precinct to speak with Guy's aunt, leaving Duncan alone in the interview room. SH Tr. 14, 46–47. The detectives returned almost two hours later, at which time they gave Duncan some food. SH Tr. 14, 48. They then left Duncan alone for about 90 minutes. SH Tr. 14, 48. At about midnight, the detectives questioned Duncan again for about 20 minutes. SH Tr. 47–51. At 1:00 a.m., they asked Duncan to tell them about any friends who might know what happened to Guy, or for suggestions about where she might be. SH Tr. 51–53. Duncan was "very cooperative" during this time. SH Tr. 51–52. The detectives left Duncan alone again at about 2:00 a.m. When they returned 30 minutes later, they found Duncan asleep. SH Tr. 54–55. After letting him sleep for another fifteen minutes, the detectives returned to find Duncan awake, and they resumed their questioning at about 2:45 a.m. SH Tr. 54–55.

At about 4:30 a.m., the detectives tried a new tack: Detective Bond told Duncan that Guy's body had been found in a vacant lot, that there was a surveillance camera near the lot, and that Duncan had been caught on videotape dumping Guy's body. SH Tr. 15–16, 63–66. Detective Bond acknowledged at the suppression hearing that this statement was false, but claimed that he made it to provoke a reaction and not necessarily a confession. SH Tr. 16, 65–66. Duncan continued to stand by his earlier statements denying knowledge of what happened to Guy despite Bond's remarks. However, about thirty minutes later, Bond repeated to Duncan that he had been caught on tape dumping Guy's body and told Duncan that the time had come for him to explain what happened. SH Tr.

63, 66–67. At that point, Duncan was on the verge of crying, and Detective Johnson began to console him. SH Tr. 16, 68. The detectives gave Duncan a cigarette and some water. SH Tr. 68–69. Duncan, who was now crying, finally said, "you know, she just kept [expletive deleted] with me." SH Tr. 69.

The detectives then told Duncan to take some time to pull himself together and left him alone for about ten minutes. SH Tr. 16–17, 69–70. When they returned, Duncan, without having been asked a question, stated, "She just kept [expletive deleted] with me and I couldn't take it no more." SH Tr. 17, 70–71. Detective Bond interrupted and read Duncan his Miranda rights from a printed card. SH Tr. 17, 71. Duncan responded by agreeing to waive his rights and make a statement. SH Tr. 18–19, 71–72. He then proceeded to describe how Guy asked him for money to buy crack and how, when he refused, Guy came at him with a baseball bat. Duncan further stated that he reacted by grabbing Guy around her neck with his hands and choking her, and that Guy then went limp and died. SH Tr. 20–21. The statement was reduced to writing and Duncan signed it. SH Tr. 21, 72. Duncan was coherent, did not appear to be high or intoxicated, and was never subjected to physical force or threats. SH Tr. 23.

After Duncan signed the written statement, Detective Bond told Duncan he was going to call the District Attorney's office to arrange for Duncan to make a videotaped statement, but that it was Duncan's decision whether to make the statement or not. SH Tr. 22, 75. Detective Bond promised Duncan he would be treated like a gentleman. He and the other detectives then ate breakfast with Duncan. SH Tr. 77.

Several hours later, at about 9:45 a.m., Duncan met with Assistant District Attor-

ney Paisner, the prosecutor at his trial. SH Tr. 85. Detective Bruton was present as well. SH Tr. 85. Paisner again advised Duncan of his Miranda rights and Duncan responded that he understood them and was willing to make a statement. Duncan then described again, with a video camera recording his statement, how Guy attacked him with a baseball bat and how he responded by grabbing her throat. Respondent Ex. F.

The trial court denied Duncan's suppression motion. Finding Detectives Bond and Bruton credible, the court ruled that Duncan was not in custody when he stated, "She just kept [expletive deleted] with me and I couldn't take it no more," and was properly advised of his Miranda rights before any further interrogation took place. SH Tr. 111–12. Accordingly, all of Duncan's statements were admitted at trial.

### B. The Evidence Presented at Trial

The prosecution's case at trial rested in large part upon Duncan's inculpatory statements. Detectives Bond and Bruton described the events leading up to Duncan's written and videotaped statements, including the statements Duncan made without benefit of Miranda warnings. Duncan's written and videotaped statements were presented to the jury as well. Tr. 192–94, 398–99.

Duncan's incriminating statements were corroborated in part by other evidence presented by the prosecution at trial. Dr. Joaquin Gutierrez, a deputy medical examiner, described the results of the autopsy he performed on Guy's body, which indicated that the cause of Guy's death was manual strangulation. Tr. 278–79. Police Officer Thierry Presume testified that she responded to a call for emergency assistance, apparently made by Guy on April

23, 1999, less than two months before her death. According to Presume, Guy seemed scared and distraught, and told Presume that she was afraid to go back inside where her husband was because he had assaulted her in the past. Tr. 310–18. Marisol Torres, who lived upstairs from Guy and Duncan, stated that the two fought constantly in the Spring of 1999 and that, on one occasion, Guy had come to her apartment, crying and scared, with scratches on her neck, hands and left arm. Tr. 58–60.

Duncan did not testify at his trial. He did, however, present evidence. Police Officer Edmond McDonald described responding to a 911 call made by Guy. According to Officer McDonald, Guy was intoxicated when he arrived and denied having been assaulted. Tr. 439–46. Duncan also called Guy's aunt, Ruby Williams, as a witness. Williams testified that Guy had three daughters named Shallay, Keisha and Lonnie, and that Williams had custody of the three children. Tr. 469–470. Williams described how, on April 20, 1998, Guy came to her house and, once there, knocked Shalley down and then proceeded to punch Shalley in the eye and kick her as she lay on the ground. Tr. 471–472. As a result of that episode, Williams obtained an order of protection prohibiting Guy from having any contact with Williams or Guy's own three children for a one-year period. Tr. 472–75.[2]

### Discussion

### A. Statute of Limitations

■ The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires that a petition seeking a writ of habeas corpus be filed within one year of when the challenged conviction becomes

---

**2.** Both the prosecution and defense called additional witnesses whose testimony is not relevant to the issues presented by Duncan's peti-

tion and is accordingly not described in this report.

final. 28 U.S.C. § 2244(d)(1)(A). A conviction is considered final for the purposes of the limitations period either when the United States Supreme Court has denied certiorari or when the petitioner's time to seek direct review in the United States Supreme Court by writ of certiorari has expired. *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir.2000). Criminal cases must be brought to the United States Supreme Court for review of a lower state court judgment within ninety days of an order by the state court of last resort denying discretionary review. Sup.Ct. R. 13.1.

The New York State Court of Appeals denied Duncan's application for leave to appeal on October 3, 2002. Duncan filed his petition for a writ of habeas corpus on December 5, 2003, less than one year and ninety days later, and thus within the limitations period.

## B. Exhaustion

█ A habeas petitioner must generally exhaust all available state court remedies before seeking federal court review, 28 U.S.C. § 2254(b)(1)(A), "thereby giving the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004) (citations omitted). A petitioner has exhausted state remedies when he has

> (i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in the lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim.

*Ramirez v. Attorney General of State of New York*, 280 F.3d 87, 94 (2d Cir.2001). Thus, "the prisoner must fairly present his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim." *Baldwin*, 124 S.Ct. at 1349 (citations omitted). The Court in *Baldwin* held that "a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material . . . that does so." *Id.* at 1351.

## C. AEDPA's Standard of Review

█ Under AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has explained that this statute "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).[3] Thus, under AEDPA, a federal habeas court may not issue a writ simply because it decides that the state court applied Supreme Court precedent incorrectly. *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003). Rather,

---

**3.** Although Justice Stevens announced the judgment of the Court and delivered its opinion with respect to Parts I, III and IV, Justice O'Connor delivered the opinion of the Court with respect to Part II. The portion of the opinion quoted in the text is drawn from Justice O'Connor's decision with respect to Part II.

[u]nder the "contrary to" clause, a federal habeas court may grant the writ [only] if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently that [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams,* 529 U.S. at 412–13, 120 S.Ct. at 1523. *See also Henry v. Poole,* 409 F.3d 48, 67–68 (2d Cir.2005).

An " 'adjudication on the merits' is a substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman,* 261 F.3d 303, 313 (2d Cir.2001) (citing *Aycox v. Lytle,* 196 F.3d 1174, 1178 (10th Cir.1999)). The state court decision need not explicitly refer to the federal claim or relevant federal case law for the deferential AEDPA standard of review to apply. *Sellan,* 261 F.3d at 312; *see also Gutierrez v. McGinnis,* 389 F.3d 300, 304 (2d Cir.2004).

## D. Admissibility of Duncan's Statements to the Police and Prosecution

Duncan first seeks habeas relief on the ground that his statements to the police and prosecution should have been suppressed. Habeas Pet. Ground 1. Three sets of statements are at issue: (1) oral statements Duncan made to the police at the precinct before being advised of his *Miranda* rights; (2) a post-*Miranda* statement made to police almost immediately after the unwarned statement which was memorialized in writing; and (3) a post-*Miranda* videotaped statement made several hours later to an assistant district attorney. Duncan argues that his pre *Miranda* statements should have been suppressed as the product of unwarned coercive custodial interrogation and that his post-*Miranda* statements should have been suppressed as fruit of the poisonous tree.

As discussed above, the trial court found that Duncan was not in custody when he first made inculpatory statements and was given *Miranda* warnings promptly after being placed under arrest. SH Tr. 107–112. Duncan raised his *Miranda* claim on direct appeal. The Appellate Division disagreed with the trial court and concluded that Duncan was in custody before he was first advised of his *Miranda* rights. *People v. Duncan,* 295 A.D.2d 533, 744 N.Y.S.2d 444 (2d Dep't 2002). The Appellate Division went on to hold, however, that the statements Duncan made before receiving his rights were essentially innocuous, and that, "[i]n any event, assuming that the oral and written statements were tainted, this did not render the subsequent videotaped confession inadmissible." 295 A.D.2d at 535, 744 N.Y.S.2d at 445.

I find it difficult to agree with the Appellate Division's conclusion that Duncan's pre *Miranda* statements were not incriminating. Until Duncan said, "She just kept [expletive deleted] with me and I couldn't take it no more," the police had no evidence that Duncan was responsible for Guy's death other than the apparent inconsistencies in Duncan's repeated claims of innocence. Duncan's concession that he "couldn't take it no more"—particularly coming, as it did, on the heels of the claim by the police that they had knowledge of Duncan's having dumped Guy's body—might reasonably be construed as an admission of guilt.

However, the Appellate Division's decision to affirm Duncan's conviction was not contrary to, or an unreasonable application of, applicable Supreme Court precedent. To the contrary, the Appellate Divi-

sion's ruling that the trial court's decision to admit Duncan's statements was not reversible error was consistent with the Supreme Court's holding in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad,* the Court held that an initial failure to administer *Miranda* warnings, absent actual coercion or other circumstances calculated to undermine a suspect's free will, does not taint subsequent admissions made after the suspect has been fully advised of his *Miranda* rights and waives them. 470 U.S. at 318, 105 S.Ct. at 1298. Rather,

> a properly warned confession [need not] be suppressed because it was preceded by an unwarned but clearly voluntary admission ... In these circumstances, a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible.

*Elstad,* 470 U.S. at 310–11, 105 S.Ct. at 1293–94. Admissibility of the warned confession depends on whether it, and any prior inculpatory statements made without benefit of *Miranda* warnings, were voluntarily made. *Id.,* 470 U.S. at 318, 105 S.Ct. at 1297–98.

Duncan argues that the Supreme Court's holding in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), narrowed the rule in *Elstad* and supports his *Miranda* claim. In *Seibert,* the Supreme Court confronted a police protocol taking tactical advantage of the Court's holding in *Elstad.* Under the protocol, officers would question suspects in custody without providing *Miranda* warnings until they obtained a confession, and then administer warnings and prompt the suspect to repeat his incriminating statements. 124 S.Ct. at 2605. The Court described the practice as "a police strategy adapted to undermine the *Miranda* warnings." 124 S.Ct. at 2612. There is no indication that the police in this case adopted any strategy to avoid *Miranda.*

Moreover, *Seibert* was decided on June 28, 2004, long after Duncan's conviction became final, and thus is not "clearly established Federal law" properly considered in deciding his petition. *See e.g., Yarborough v. Alvarado,* 541 U.S. 652, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) (pointing out that, "[f]or purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the Supreme] Court 'refers to the holdings ... of this Court's decisions *as of the time of the relevant state-court decision'* ") (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)) (emphasis added); *Brown v. Greiner,* 409 F.3d 523, 533 (2d Cir.2005) (holding that habeas review requires an analysis of "whether the state court's interpretation was unreasonable in light of the holdings of the United States Supreme Court at the time.... Later Supreme Court decisions play no role in assessing the reasonableness of the state court decisions.").

■ Accordingly, the clearly established federal law applicable to Duncan's petition is the holding in *Elstad,* and does not include the decision in *Seibert.* As noted above, *Elstad* holds that a warned confession, even when obtained after a suspect in custody makes incriminating statements without the benefit of *Miranda* warnings, depends upon the voluntariness of the suspect's statements. To determine the voluntariness of a statement, a court must examine the totality of the circumstances under which it was made. *Parsad v. Greiner,* 337 F.3d 175, 183 (2d Cir.2003). In *Parsad,* a defendant was questioned intermittently at a police station for more than three hours before *Miranda* warnings were administered. *Id.* at 184. As the questioning progressed, the officers confronted the defendant with inconsistencies in his account. *Id.* at 185. Nevertheless, the court held that the defendant's

unwarned statements were voluntarily made. In reaching its conclusion, the court took into account the fact that, like Duncan, the defendant was not cuffed and was offered food, and was subjected only to intermittent rather than continuous questioning.

The Second Circuit considered the voluntariness of statements made under circumstances more coercive than those which confronted Duncan in *Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir.1998). The police arrived at the home of Martin Tankleff at 6:17 in the morning in response to a 911 call made by Tankleff, who was then seventeen years old. *Id.* at 240. Officers found Tankleff's mother murdered in her bedroom and his father gravely wounded in his study. *Id.* At about 7:40 a.m., the police began to question Tankleff in a squad car. *Id.* After about an hour of questioning, Tankleff agreed to accompany the officers to the police station. *Id.* Tankleff arrived at the station at about 9:40 a.m., where he was held in a small, windowless room and questioned continuously for two hours. *Id.* The officers confronted Tankleff with what they perceived to be inconsistencies in his story, at times with raised voices. *Id.* At about 11:45 a.m., the officers falsely told Tankleff that his father was awake and had accused him of the attacks. *Id.* at 241. After persisting in denying any involvement, Tankleff wondered aloud whether he could have attacked his parents while "blacked out" or "possessed." *Id.* at 241. Only then, just before noon, did the police advise Tankleff of his rights under *Miranda. Id.* Despite these circumstances, the Court held that Tankleff's unwarned statements "barely did not entail that degree of coercion" which would have rendered them involuntary. *Id.* at 245.

In contrast, the police first arrived at Duncan's home because he had reported his wife as missing. Duncan was not a suspect at that time and he voluntarily accompanied the officers to the police station. Duncan and the officers returned to Duncan's home twice in an effort to find documents that might help the police in their investigation of Guy's murder. The officers began to focus on Duncan as a suspect only when the documents they retrieved failed to support Duncan's account of the events leading up to Guy's death. Even at that point, Duncan was questioned only intermittently and was given food and a chance to nap between sessions. The officers described Duncan as cooperative and there is no indication in the record that the officers used physical force, threatened Duncan, or even raised their voices at any point during the interrogation.

After hearing the testimony of Detectives Bond and Bruton, the trial court concluded that "[t]he police were not coercive" and that Duncan "knowingly, intelligently and voluntarily waived his rights." SH Tr. 108. For the reasons stated above, this was not "an unreasonable determination of the facts in light of the evidence presented" at the suppression hearing. 28 U.S.C. § 2254(d)(2). Moreover, I have reviewed the videotape recording of Duncan's post *Miranda* statements to the prosecutor. On the tape, Duncan appears alert, clear-headed and relaxed, and is responsive and cooperative as he answers the prosecutor's questions. There is no indication that Duncan was frightened or exhausted, or that his ability to assert his rights was in any way compromised. Under all these circumstances, it is reasonable to conclude that Duncan's pre-*Miranda* statements were made voluntarily and that therefore, under *Elstad*, they did not taint his two warned confessions. Accordingly, the state court's decision to admit Duncan's written and videotaped confessions was

not contrary to applicable Supreme Court precedent.

█ The trial court's decision to admit the statements Duncan made before *Miranda* warnings were administered was error. However, Duncan's post-*Miranda* confessions were far more explicit and self-incriminating than his earlier admissions. For example, Duncan's written statement contains the following language:

> She kept asking me money [sic] to buy crack and I wouldn't give her any more money. She got upset. She was drinking a beer. I thought she was going to get another beer, but she got a bat. She swung the bat at me. I ducked. Then I grabbed her around the neck with my hands. I started choking her. She went limp. The next thing I knew she was dead.... The only thing I could think of was to get her out of the house. I put her body in a black plastic bag and covered her up. I walked down Lewis Avenue. My mind was wandering. It was daylight. I ended up on Van Buren and Stuyvesant. I saw the lot and I dumped her.

Tr. 193. Duncan essentially repeated these statements when questioned by the prosecutor on videotape. Respondent's Ex. F. In light of the decision to admit Duncan's more damaging post *Miranda* confessions, any error in permitting the jury to hear Duncan's unwarned statements was harmless. *See Parsad,* 337 F.3d at 185; *Tankleff,* 135 F.3d at 244. This prong of Duncan's petition should therefore be rejected.

## E. Jury Charge and Evidentiary Rulings

Duncan next seeks habeas relief by challenging certain jury instructions and evidentiary rulings of the trial court. Duncan raised these claims in his *pro se* supplemental brief to the Appellate Division (Resp. Ex. D at 9–16). Respondent contends that these claims are nevertheless unexhausted because Duncan failed to refer to federal constitutional provisions or case law. A district court may, in its discretion, deny habeas petitions containing unexhausted claims on their merits. 28 U.S.C. § 2254(b)(2). I conclude, for the reasons stated below, that these claims fail on their merits, and I therefore do not reach the issue of exhaustion.

### 1. Court's Charge on Justification

Duncan first argues that the trial court failed to instruct the jury properly with respect to justification, or self-defense. Habeas Petition Ground 2. Duncan does not challenge the trial court's explanation of the elements of self-defense. Rather, Duncan contends that the trial court failed to comply with state court precedent requiring an explicit instruction that, once jurors find a defendant not guilty of one count of murder or manslaughter based upon self-defense, they must not consider the remaining charges.[4]

█ "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62,

---

4. In his *pro se* brief to the Appellate Division, Duncan also contended that the instructions were improper because the trial judge failed to inform the jurors that a person who believes he is about to be subjected to physical force has a duty to retreat unless he is in his dwelling place. *See* Resp. Ex. D at 9. Duncan does not raise this issue in his habeas petition. In any event, the claim lacks merit. Petitioner was in his own dwelling at the time he claims Guy threatened him, and he therefore had no duty to retreat. Thus, the trial judge's omission of the legal concept of the duty to retreat was proper. *See People v. Jones,* 4 A.D.3d 853, 772 N.Y.S.2d 778 (4th Dep't 2004) (finding it "preferable" for a trial court to avoid confusing the jury by not mentioning the duty to retreat if defendant was in his home at the time of the encounter).

67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). A jury instruction in a state trial is normally a matter of state law and challenges to a jury charge are therefore not typically subject to federal habeas review. *See Morales v. Keane*, No. 92–Civ–8189, 1994 WL 38668, at *3 (S.D.N.Y. Feb. 4, 1994). Accordingly, in asserting his claim that the trial court's instructions on justification were improper, Duncan "faces a substantial burden." *DelValle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir.2002). To prevail, Duncan must demonstrate that the instruction was not merely "undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *see also DelValle*, 306 F.3d at 1200–01; *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir.2001). In weighing the prejudice from an allegedly improper charge, the challenged instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 147, 94 S.Ct. at 400. The question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.*

The trial court in Duncan's case submitted four counts to the jury: murder in the second degree based upon a theory of intent to cause death; murder in the second degree based upon a theory of depraved indifference to human life; manslaughter in the first degree; and manslaughter in the second degree. Tr. 559. The court explained the elements of each of the four counts without reference to justification. Tr. 559–66. The Court then turned to the issue of self-defense and, in a portion of the instructions clearly applicable to each of the four pending charges, set forth the elements of justification. Tr. 566–72. The Court's instruction to the jury included the following admonition:

> Even if a defendant is otherwise guilty, if you should determine that he acted in self-defense, that is, with justification, then he must be found not guilty. Self-defense is a defense recognized by the law. When a defendant raises such a defense and offers some evidence that he was acting in self-defense, it becomes the burden of the People to convince you beyond a reasonable doubt the he was not acting in self-defense.

> \* \* \*

> If the People fail to … convince you beyond a reasonable doubt [that the defendant did not act in self-defense], then you must find that the defendant acted in self-defense and find him not guilty of the crimes charged. Only if the People convince you beyond a reasonable doubt that the defendant was not acting in self-defense must you find him guilty of the any of the crimes charged.

Tr. 567, 572.

Duncan's challenge to the trial court's charge is that it did not include an explicit instruction that, upon finding Duncan not guilty of any one charge on grounds of self-defense, the jury must not consider the remaining charges. Duncan's argument is based upon a series of New York State cases which have held that jurors must be charged "that if they found the defendant not guilty of a greater charge on the basis of justification, they [are] not to consider any lesser counts." *People v. Feuer*, 11 A.D.3d 633, 634, 782 N.Y.S.2d 858 (2d Dep't 2004) (citing *People v. Ross*, 2 A.D.3d 465, 767 N.Y.S.2d 819 (2d Dep't 2003); *People v. Roberts*, 280 A.D.2d 415, 721 N.Y.S.2d 49 (1st Dep't 2001); *People v. Bracetty*, 216 A.D.2d 479, 480, 628 N.Y.S.2d 739; *People v. Castro*, 131 A.D.2d 771, 773, 516 N.Y.S.2d 966 (2d Dep't 1987)). The purpose of this requirement is to prevent inconsistent verdicts, such as a

finding of not guilty of murder on grounds of justified use of force in self-defense, but nevertheless guilty of manslaughter. *See People v. Hoy*, 122 A.D.2d 618, 619, 504 N.Y.S.2d 939 (4th Dep't 1986).

Duncan argues that *Feuer* and the cases it relies upon require a trial court to instruct jurors explicitly that once they find a defendant not guilty by reason of justification on one charge they should not consider any other charges, and that no alternative choice of words which communicates the same message will suffice. This seems to me to be an overly literal reading of the pertinent case law, and one that is in any event not compelled by the New York Court of Appeals cases upon which *Feuer* and the other Appellate Division cases cited in the text rest. In *People v. McManus*, 67 N.Y.2d 541, 505 N.Y.S.2d 43, 496 N.E.2d 202 (1986), a conviction was reversed not because of a failure to advise the jury explicitly that they must acquit a defendant of lesser charges after finding him justified in using force with respect to a greater charge, but because the trial court erroneously decided that the defense of justification could not apply to a charge of depraved indifference murder. In *People v. Torre*, 42 N.Y.2d 1036, 399 N.Y.S.2d 203, 369 N.E.2d 759 (1977), reversal was based on the trial court's decision to instruct the jury on justified use of force in defense of another but not in self-defense, despite evidence supporting a self-defense charge.

■ The trial court's instructions in this case achieved the result mandated by *Feuer* and the other cases cited by Duncan, even if it did so with different words than those cases suggest. After explaining the other elements of each of the crimes with which Duncan was charged, the trial court clearly explained to the jurors, in an instruction explicitly made applicable to each of those crimes, that they were required to find Duncan not guilty of all charges against him unless they were convinced beyond a reasonable doubt that Duncan was not acting in self-defense.

■ Even if the trial court's instruction did constitute error under state law, that error would not be grounds for habeas relief. The Supreme Court has noted the "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987). Because the trial court instructed the jury that a failure to prove that Duncan was not acting in self-defense mandated a verdict of not guilty on all charges, any error in the particular language of the charge under New York law did not "by itself so infect[ ] the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147, 94 S.Ct. at 400. Indeed, in *Morales v. Keane*, the court denied a habeas petition raising a similar claim, holding that any error in the state trial court's instruction concerning the "proper sequence of deliberation regarding the justification defense and the homicide counts" did not rise to the level of a constitutional due process violation. 1994 WL 38668, at *2 and *4. This aspect of Duncan's habeas petition should therefore be denied.

## 2. Admissibility of Evidence of Victim's Violent Nature and Psychiatric Record

■ Duncan further contends that his conviction should be set aside because "psychiatric records" and "specific acts of violence committed by [the] deceased were not allowed to be presented to the jurors." Habeas Petition Ground 3. However, even "[e]rroneous evidentiary rulings by a state trial court generally do not rise to the level of constitutional violations upon which a federal court may issue a writ of habeas

corpus." *Rodriguez v. Herbert,* 2004 WL 1125431, at *7 (E.D.N.Y. May 20, 2004) (citations omitted). "Erroneously excluded evidence warrants habeas relief only if the omission deprived the petitioner of a fundamentally fair trial." *Id.* (citations omitted). This test "centers on whether the excluded evidence would have created 'a reasonable doubt that did not otherwise exist.'" *Id.* (quoting *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976)).

██ Duncan's claim fails because a review of the record reveals that the trial court repeatedly permitted defense counsel to explore Guy's substance abuse, psychiatric problems, and history of violence. Defense counsel raised these matters in his opening statement, during cross-examination of two prosecution witnesses, during direct examination of a defense witness, and in summation. *See* Tr. 9–10 (references in defense counsel's opening to Guy's drug and alcohol abuse and history of violence); 47–50 (ruling by trial judge rejecting prosecution's argument that references to Guy's suicide attempt and psychiatric hospitalization in Duncan's calendar should be redacted before the calendar was received in evidence); 122–28 (testimony on cross-examination of prosecution witness Beverly Douglas, one of Guy's close friends, acknowledging that she has seen Guy high; that Guy became loud when high; that she obtained a court order of protection directing Guy not to harass her and was forced to call the police to enforce the order of protection when Guy continued to harass her even after the order was issued; and that she observed Guy and Duncan screaming at and hitting each other); 469–75 (testimony of Guy's aunt, who had custody of Guy's children, that Guy was physically violent with her own children and verbally abusive to her, leading her to obtain an order of protection from the Family Court keeping Guy away from her and from Guy's own children). Duncan's counsel reviewed the evidence of Guy's violent behavior and psychiatric problems in his summation, relying in part on the evidence described above and in part on the statements Duncan himself made when interrogated by the police and prosecution:

> [Duncan] explains to you through his statement . . . that she [Guy] has a psychiatric condition, she's on certain medication. You know from the defendant what medication she was on. . . . You will find out when you take this calendar into the jury room the reason she tried to commit suicide and was hospitalized. . . . He knew that she could be violent. He knew about past episodes that she had had with the police and when she had been arrested. . . . You know certainly that from some of the testimony we heard this morning where an order of protection was issued after she punched her own daughter in the eye. Her daughter was on the ground. What does she do? She kicked her. Fifteen year old girl. You know that Terry could be abusive when she was drinking and when she was high.

Tr. 505–06. Duncan's attorney also told the jury that "you know from Mr. Duncan Ms. Guy used to use that bat all the time, something she used to whack and break things up with. He told you about the busted phone, banged up wall with dents in it. . . . Busted mirror." Tr. 508–09. The trial court, moreover, in the course of its instruction on self-defense, told the jury it could properly consider Duncan's "prior knowledge of [the victim's] reputation for violence; any prior specific assault by Julia Guy upon the defendant or upon others; or any prior threat made by her against the defendant." Tr. 571.

As demonstrated above, Duncan was permitted by the trial judge to make ample reference to Guy's psychiatric prob-

lems, substance abuse and history of violent behavior. Moreover, Duncan fails to point to any particularly compelling evidence excluded by the trial court. Accordingly, petitioner's claim for habeas relief on the grounds that the trial court excluded evidence of Guy's psychiatric record, drug abuse and violent nature is belied by the record of his trial and should be denied.

### 3. Prosecution's Use of Perjured, Misleading or Evasive Testimony

 Duncan next contends his conviction should be set aside because the "trial court allowed the prosecutor to present witnesses to the jury that they [sic] knew gave misleading, evasive, perjured testimony." Habeas Petition Ground 4: A petitioner's claim that his conviction was based on perjured testimony is analyzed under the Due Process Clause of the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). Under this standard, a conviction must be set aside "if the prosecution knew, or should have known, of the perjury," and "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir.2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

In *Drake*, the prosecution was forced to concede that its proof at trial included false testimony. 321 F.3d at 343. In contrast, Duncan has failed to present any reason to believe—other than his own conclusory assertions—that any of the evidence presented by the prosecution was false, much less that the prosecution knew or should have known that it was. For this reason, this aspect of Duncan's petition should be denied as well.

Duncan also argues that he should be granted habeas relief on the grounds that the trial court admitted prejudicial testimony from police officer Thierry Presume. Tr. 311–19. Officer Presume testified, in part, that he responded to a 911 call Guy made three months before her murder. Guy, who was distraught when Officer Presume found her in the street, told Officer Presume that she and Duncan had been fighting. Although Guy acknowledged that she had not been assaulted or injured, she said she was afraid for her safety because Duncan had choked, punched and kicked her in the past. *Id.*

At the conclusion of Officer Presume's testimony, the trial judge gave the jury a limiting instruction regarding the testimony, stating in part as follows:

"Now, the fact that these things may have happened then is no proof whatsoever again that the defendant possessed a propensity or disposition to commit the crimes charged in this indictment, or any other crime. And it's not offered for that purpose, and it must not be considered by you for that purpose. Instead, again, the People offer such evidence solely insofar as it establishes the defendant's intent and to present a narrative of the parties' relationship. I charge you that such evidence may be considered by you only for such limited purposes and for no other, okay?"

Tr. 328–29. The court also included a similarly-worded limiting instruction in its final charge to the jury, reminding the jurors of the limited purposes for which the evidence could be used. Tr. 551–52. Following Officer Presume's testimony at trial, Duncan moved for a mistrial, but the motion was denied. Tr. 330–36.

 This aspect of Duncan's petition should be denied as well. To obtain habeas relief on evidentiary grounds, "petitioner must demonstrate that admission of the challenged evidence violated a constitutional right ... and that the challenged

evidence was of such magnitude when viewed objectively in light of the entire record as to provide the basis for conviction or remove a reasonable doubt that would have existed on the record without it." *Bynum v. Duncan,* 2003 WL 296563, at *8 (S.D.N.Y. Feb. 12, 2003) (citations omitted). "Both state and federal practice permit evidence of petitioner's uncharged crimes or bad acts on the prosecution's direct case, provided that the evidence is relevant to some issue other than petitioner's criminal disposition, and the probative value outweighs any prejudice." *Id.* (citing Fed.R.Evid. 403, 404(b); *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)). "If the evidence admitted satisfied the Federal Rules of Evidence, habeas relief may not obtain." *Bynum,* 2003 WL 296563, at *8 (citing *Ford v. Crinder,* 2001 WL 640807 (S.D.N.Y. June 8, 2001)).

 As stated by the trial judge in his limiting instructions, the testimony of Officer Presume was, in fact, relevant to issues other than Duncan's propensity to commit crimes. Rather, the prior interactions between Duncan and Guy were admitted for the limited purpose of assisting the jury to evaluate Duncan's motive and intent at the time he choked Guy. This was particularly relevant because Duncan offered evidence of Guy's substance abuse, psychiatric history and violence toward others. These facts about Guy were placed into context, at least to some extent, by evidence indicating that the relationship between Duncan and Guy was marked by violent behavior on both their parts. Thus, the evidence might reasonably have been received in a federal trial pursuant to Federal Rule of Evidence 404(b) as probative of Duncan's intent when he placed his hands around Guy's neck. Moreover, the limiting instructions of the trial judge, both at the time the evidence was received and as part of the jury charge, served to minimize the poten-

tial for prejudice. In any event, the evidence was not "of such magnitude" that it might have "provide[d] the basis for conviction or remove[d] a reasonable doubt that would have existed on the record without it." *Bynum,* 2003 WL 296563, at *8. Accordingly, petitioner's claim for habeas relief on the grounds that Officer Presume's testimony was unfairly prejudicial should be denied.

### 4. Ineffective Assistance of Trial and Appellate Counsel

In his original petition, Duncan complained about the effectiveness of his trial and appellate counsel, but did not assert ineffective assistance as a ground for relief. Habeas Petition at 12, ¶ 13(b). Duncan did, however, file a supplement ("Pet. Supp.") to his petition in which he sought leave to add claims of ineffective assistance of counsel at trial and on appeal. Docket Entry 6. Petitioner then filed two additional submissions ("Second Supp." and "Third Supp.") amplifying his claims of ineffective assistance. Docket Entries 16, 19.

Duncan did not raise his ineffective assistance of counsel claims on direct appeal or by means of a collateral attack in the state courts. Nevertheless, for the reasons described below, I recommend that the claims be reached and denied on their merits pursuant to 28 U.S.C. § 2254(b)(2).

A court reviewing a habeas petition claiming ineffective assistance of counsel applies a two-part test: the petitioner must establish 1) that counsel was deficient; and 2) that petitioner suffered prejudice as a result of the deficiency. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Under the first prong, defendant must overcome a strong presumption that counsel's conduct was reasonable and constituted "sound trial strategy." *Id.,* 466 U.S. at 689, 104 S.Ct. at 2065. Having established

that counsel's performance was deficient, a defendant must then "affirmatively prove prejudice." 466 U.S. at 693, 104 S.Ct. at 2067. To establish prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome" since virtually all of counsel's acts have some effect. *Id.* Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694, 104 S.Ct. at 2068. Claims of ineffective assistance of trial and appellate counsel are reviewed under the same standards. *Smith v. Robbins,* 528 U.S. 259, 289, 120 S.Ct. 746, 766, 145 L.Ed.2d 756 (2000); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994).

In his first supplemental submission, Duncan asserts that his trial counsel was ineffective because he "[n]eglected to vigorously oppose the prosecutorial misconduct," "[misled] the jury with evidence," and withheld "relevant information." Docket Entry 6. Duncan does not specify in his supplement what the prosecutorial misconduct, misleading evidence, or withheld information was. Moreover, I have reviewed the record of Duncan's trial and found no factual basis for any of these conclusory assertions.

■ In the same submission, Duncan argues that his appellate counsel was ineffective because she failed to provide Duncan with a transcript of the argument on appeal. Even assuming for purposes of argument that a failure to provide a defendant with a transcript of an appellate argument could constitute deficient performance, there would be no resulting prejudice.

■ Duncan's second supplement raises additional ineffective assistance claims. Docket Entry 16. First, he contends that his counsel was unprepared to conduct his suppression hearing because he received relevant documents from the prosecution only on the very morning the hearing was held. The record shows, however, that Duncan's counsel sought and obtained an adjournment of more than two hours to examine the materials and had the opportunity to review them "fairly thoroughly" before the suppression hearing began. SH Tr. 2–5. Moreover, Duncan makes no showing of what was contained in the documents or how his counsel might more effectively have represented him had he obtained a continuance of the hearing. Duncan also suggests in his letter that his trial counsel failed to assert that Duncan was acting in self-defense when he choked Guy. As discussed above, however, the trial court instructed the jury to consider self-defense. In addition, defense counsel stressed Duncan's claim of self-defense throughout his summation. Tr. 488, 507–08, 512, 516.

■ Duncan's final complaint in his second supplement is that his attorney counseled him not to testify in his own defense. A criminal defense attorney has a duty to inform a defendant of his right to testify and may not prevent a defendant who wishes to testify from doing so. Counsel also has a duty, however, to offer advice about the wisdom of taking the stand.

> [C]ounsel should always advise the defendant about the benefits and hazards of testifying and not testifying, and may strongly advise the course that counsel thinks best, [but] must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter.

*Brown v. Artuz,* 124 F.3d 73, 79 (2d Cir. 1997). Duncan had a significant prior criminal record and would thus have been subject to damaging impeachment had he

testified.[5] Moreover, because the prosecution introduced Duncan's written and videotaped post-arrest statements into evidence, Duncan's version of Guy's death was put before the jury. Indeed, as they watched the videotape, the jurors heard Duncan explain with his own voice and in his own words how Guy attacked him, and they observed Duncan's demeanor as he related the relevant facts. As a result, defense counsel was able to argue to the jury in his summation about the credibility of Duncan's version of events without having exposed Duncan to cross-examination. In any event, Duncan does not assert that his counsel precluded him from testifying, but only that counsel urged him not to do so. This advice was reasonable and proper.

In his third supplemental submission, Duncan reiterates some of the same claims addressed above, and I do not discuss them again here. Docket Entry 19. In addition, Duncan raises a litany of new claims, most of which may be dealt with briefly. Duncan claims that his counsel should have argued that, because Duncan had an outstanding warrant when the police first came to his home on the night of June 11, 1999, he must have been under arrest at that time, and that any subsequent questioning was in violation of *Miranda*. Third Supp. at 1. As discussed above, however, any *Miranda* violation in Duncan's case was, as *Elstad* holds, cured when warnings were later administered. Moreover, a suspect is in custody when he reasonably believes he is not free to leave; custody is not established by evidence that the police had a lawful basis to arrest the suspect if the police have not yet communicated that they intended to make an arrest. *Yarborough*, 124 S.Ct. at 2148–49 (citing *Stansbury v. California*, 511 U.S.

318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) and *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). Duncan asserts that his lawyer should have obtained more information about the 911 calls for emergency assistance which were referred to during his trial, but offers no basis to believe that any additional exculpatory information could have been developed. Third Supp. at 2. Duncan contends as well that his attorney should have called a medical expert to rebut the testimony of the prosecution's medical examiner, but again fails to identify any specific exculpatory evidence such an expert might have provided. Third Supp. at 2. Indeed, this aspect of Duncan's claim is particularly curious, in that Duncan concedes, as the medical examiner testified, that Guy was choked to death. Duncan's additional complaints that his lawyer failed to take pictures of Duncan's apartment, where the crime took place, or to interview Duncan's neighbors, are similarly lacking in merit for failure to demonstrate that such steps—assuming for sake of argument that counsel did not in fact take them—would have helped the defense prevail at trial. Third Supp. at 3.

A more lengthy attack on appellate counsel boils down to a general assertion that counsel failed to raise all of the available meritorious issues. With the exception of the trial court's charge on self-defense, which is discussed below, Duncan fails to coherently identify the particular issues he contends appellate counsel failed to raise. In any event, appellate counsel is not required to raise every nonfrivolous claim. *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Accordingly, a "decision by counsel to omit certain claims on appeal plainly does not

---

**5.** As noted above, Duncan was sentenced as a second violent felony offender. Duncan's prior record was specifically discussed during his sentencing hearing. *See* Sent'g Tr. 9, 18–20 (Respondent's Ex. A, Part 7).

constitute ineffective assistance." *Kearse v. Walker,* 123 F.Supp.2d 652, 658 (E.D.N.Y.2000).

Duncan's most cogent ineffective assistance contention is that his trial counsel should have objected to the court's charge on self-defense and that his appellate counsel should have raised the court's charging error on appeal. As discussed above, Duncan contends that the trial court erred when it failed to include in its charge an explicit statement that a decision to acquit on grounds of self-defense with respect to one count of murder or manslaughter precluded consideration of the remaining charges. Because, for the reasons stated above, I conclude that the trial court's instruction was not error, Duncan's ineffective assistance claim should be rejected.

 This aspect of Duncan's ineffective assistance claim would fail even if the instruction to the jury was error and should have prompted an objection by trial counsel. Duncan did not raise this issue on direct appeal and his ineffective assistance claim is therefore unexhausted. Although I might ordinarily consider staying this action to afford Duncan the opportunity to exhaust his claim in a collateral state court proceeding, to do so in this case would be futile because Duncan's ineffective assistance claim would be procedurally barred. New York Criminal Procedure Law provides that a motion to vacate a judgment must be denied when,

> [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him.

N.Y.Crim. Proc. Law § 440.10(2)(c). Here, of course, the facts necessary to assert Duncan's ineffective assistance of counsel claim on appeal—the trial court's instruction on self-defense, and the failure of trial counsel to object to that instruction—appeared on the record of Duncan's trial. Duncan is therefore procedurally barred from raising an ineffective assistance of counsel claim by means of a collateral attack upon his conviction in state court.

The United States Supreme Court has held that

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). In *Sweet v. Bennett,* 353 F.3d 135 (2d Cir.2003), the Second Circuit applied the holding in *Coleman* to a habeas petitioner's unexhausted claim that his trial lawyer was ineffective because he failed to object to a challenged jury charge. *Id.* at 139–40. The Court held that petitioner's claim was procedurally defaulted for purposes of federal habeas review pursuant to Section 440.10(2)(c). *Id.* The same reasoning precludes habeas review of Duncan's claim that his trial counsel's failure to object to the court's self-defense charge constituted ineffective assistance.

 Duncan claims that his appellate counsel was ineffective because she failed to challenge the court's self-defense charge on appeal. Even if it had been deficient for appellate counsel not to challenge the

 

trial court's charge on self-defense, Duncan could not have been prejudiced as a result because he raised the issue—coherently and with citation to appropriate cases—in his own *pro* se appellate brief. Respondent's Ex. D at 9.

I have considered the remaining claims raised in Duncan's Third Supplement. None raise a serious contention that trial or appellate counsel was ineffective. Duncan's claims of ineffective assistance of trial and appellate counsel should therefore be rejected on their merits.

### Conclusion

For the foregoing reasons, I respectfully recommend that Duncan's petition for a writ of habeas corpus be denied. Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Chambers of the Honorable Nina Gershon within ten days of receiving this Report and Recommendation and, in any event, on or before November 28, 2005. Failure to file timely objections may waive the right to appeal the District Court's Order. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).

GERSHON, United States District Judge.

### ORDER

In a Report and Recommendation dated November 3, 2005, the Honorable Steven M. Gold has recommended denial of this petition for a writ of habeas corpus. Petitioner has filed objections which I find to be without merit. Magistrate Judge Gold's report is adopted in its entirety, as I agree fully with his well-reasoned analysis.

Petitioner's application for a writ of habeas corpus is denied. As petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied pursuant to 28 U.S.C. § 2253(c). Moreover, the court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that *in forma pauperis status* is denied for the purpose of an appeal. The Clerk of Court is directed to enter judgment in accordance with this order.

**SO ORDERED.**